337 Conn. 739        AUGUST, 2021        739

State *v.* Bischoff

STATE OF CONNECTICUT *v.* HAJI
JHMALAH BISCHOFF
(SC 20302)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 54-194), "[t]he repeal of any statute defining or pre-
scribing the punishment for any crime shall not affect any pending
prosecutions or any existing liability to prosecution and punishment
therefor, unless expressly provided in the repealing statute that such
repeal shall have that effect."

Pursuant further to statute (§ 1-1 (t)), "[t]he repeal of an act shall not affect
the punishment, penalty or forfeiture incurred before the repeal takes
effect . . . ."

The defendant was convicted of and sentenced to an effective term of
incarceration of five years for possession of narcotics, among other
crimes, in connection with events that occurred in 2014. After the defen-
dant's arrest but prior to his conviction in 2016, the legislature amended
the statute (§ 21a-279) under which the defendant was convicted, effec-
tive October 1, 2015, by changing possession of narcotics from a class
D felony with a maximum sentence of seven years of imprisonment
to a class A misdemeanor with a maximum sentence of one year of
imprisonment. After the defendant unsuccessfully appealed from the
judgment of conviction, he filed a motion to correct an illegal sentence,
arguing, inter alia, that the legislature had intended its 2015 amendment
to § 21a-279 to apply retroactively. The trial court dismissed the motion
to correct, and the defendant appealed to the Appellate Court, which
directed the trial court to deny rather than to dismiss the defendant's
motion, concluding, inter alia, that the 2015 amendment did not apply
retroactively. On the granting of certification, the defendant appealed
to this court. *Held*:

1. The Appellate Court correctly determined that the defendant was properly
sentenced in accordance with the version of § 21a-279 that was in effect
when he committed the crimes of which he was convicted: this court
has interpreted §§ 54-194 and 1-1 (t) to embody a presumption that
changes to criminal statutes prescribing or defining punishment apply
prospectively only, unless the statute expressly states otherwise, the
plain language of the 2015 amendment did not indicate that it was to
apply retroactively, and, contrary to the defendant's claim, the legislature
did not intend to exclude ameliorative changes to sentencing schemes
from the presumption against retroactivity derived from §§ 54-194 and
1-1 (t); moreover, because the legislature was aware that this court has
interpreted §§ 54-194 and 1-1 (t) as requiring an explicit expression of

State *v.* Bischoff

intent regarding retroactivity to overcome this presumption, the legislature's silence regarding retroactivity in the 2015 amendment was evidence of an intent that it have prospective application only; furthermore, the defendant could not prevail on his claim that prospective only application of the 2015 amendment would lead to an absurd and unworkable result on the basis that the 2015 amendment was meant to implement a 2015 budget bill that the legislature anticipated would result in fiscal savings for the Department of Correction, as nothing in the language of the budget bill or its legislative history referenced the 2015 amendment or the fiscal savings that would be realized from the 2015 amendment.

2. This court declined the defendant's invitation to adopt the amelioration doctrine, which provides that amendments to statutes that lessen their penalties are applied retroactively, and to overrule *State* v. *Kalil* (314 Conn. 529), which recently rejected the applicability of that doctrine: *Kalil* thoroughly considered whether to adopt the amelioration doctrine only six years ago and was based on approximately 100 years of precedent during which time the legislature took no action to suggest any disagreement with this court's interpretation and application of §§ 54-194 and 1-1 (t); moreover, this court's analysis in *Kalil* was consistent with this court's analysis of the defendant's claim regarding the retroactivity of the 2015 amendment to § 21a-279, demonstrating that there were no conflicts or difficulties in applying the holding of *Kalil.*

(*One justice concurring separately*)

Argued September 11, 2020—officially released January 15, 2021*

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of possession of narcotics with intent to sell by a person who is not drug-dependent, possession of narcotics with intent to sell and possession of narcotics, and with one count of the crime of possession of less than four ounces of a cannabis-type substance, brought to the Superior Court in the judicial district of Fairfield, geographical area number two, and tried to the jury before *Dennis, J.*; verdict and judgment of guilty of one count of possession of less than four ounces of a cannabis-type substance and of two counts of possession of narcotics, from which the defendant appealed to the Appellate Court, *Sheldon, Elgo* and *Bright, Js.*, which affirmed the judgment; thereafter, this court denied the defendant's petition for

* January 15, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Bischoff

certification to appeal; subsequently the court, *Doyle, J.*, dismissed the defendant's motion to correct an illegal sentence, and the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Lavine* and *Harper, Js.*, which reversed the trial court's denial of the motion to correct an illegal sentence and remanded the case with direction to deny the motion, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Emily H. Wagner*, assistant public defender, with whom, on the brief, was *Judith L. Borman*, senior assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *Craig P. Nowak*, senior assistant state's attorney, and *Jennifer F. Miller*, assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. In 2015, our legislature amended General Statutes (Rev. to 2015) § 21a-279 (a) to reclassify a first offense for possession of narcotics from a class D felony subject to a maximum sentence of imprisonment of seven years to a class A misdemeanor subject to a maximum sentence of one year of incarceration. Public Acts, Spec. Sess., June, 2015, No. 15-2, § 1 (Spec. Sess. P.A. 15-2).[1] This legislative action reflected a change in

---

[1] In 2014, when the defendant committed the offense of which he was convicted, General Statutes (Rev. to 2013) § 21a-279 (a) provided: "Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned; and for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

At the time of the defendant's sentencing, General Statutes (Supp. 2016) § 21a-279 (a) provided: "(1) Any person who possesses or has under such

State *v.* Bischoff

public policy that emphasized treatment and rehabilitation over incarceration for those convicted of possessing controlled substances. In this certified appeal, we are asked to determine whether the legislature's action applies retroactively to criminal cases pending at the time the amendment became effective.

The defendant, Haji Jhmalah Bischoff, was arrested and charged with, among other crimes, possession of narcotics in violation of § 21a-279 (a) prior to the enactment of Spec. Sess. P.A. 15-2, § 1. He was not convicted and sentenced, however, until *after* the amendment's enactment. The defendant claims that both the trial court and the Appellate Court incorrectly determined that Spec. Sess. P.A. 15-2, § 1, does not apply retroactively, and, thus, he claims that the sentence imposed on him was illegal, as it exceeded the maximum sentence allowed under § 21a-279 (a) as amended. Specifically, he claims that (1) although the plain language of Spec. Sess. P.A. 15-2, § 1, does not mention retroactivity, a prospective-only application of the amendment would lead to an absurd or unworkable result when viewed in the context of Public Acts 2015, No. 15-244 (P.A. 15-244), the state budget bill that Spec. Sess. P.A. 15-2, § 1, was meant to implement, and (2) alternatively, this court should overrule *State* v. *Kalil*, 314 Conn. 529, 107 A.3d 343 (2014), and adopt the amelioration doctrine, which presumes that amendments to statutes that mitigate punishment apply retroactively. We disagree with

person's control any quantity of any controlled substance, except less than one-half ounce of a cannabis-type substance and except as authorized in this chapter, shall be guilty of a class A misdemeanor.

"(2) For a second offense of subdivision (1) of this subsection, the court shall evaluate such person and, if the court determines such person is a drug-dependent person, the court may suspend prosecution of such person and order such person to undergo a substance abuse treatment program.

"(3) For any subsequent offense of subdivision (1) of this subsection, the court may find such person to be a persistent offender for possession of a controlled substance in accordance with section 53a-40."

Unless otherwise indicated, all references to § 21a-279 (a) in this opinion are to the 2013 revision of the statute.

State *v.* Bischoff

the defendant on both accounts and affirm the Appellate
Court's judgment.

The following facts and procedural history are sup-
ported by the record and relevant to our review of
the defendant's claims. On the basis of conduct that
occurred in 2014, a jury in 2016 found the defendant
guilty of possession of heroin in violation of § 21a-279
(a), possession of cocaine in violation of § 21a-279 (a),
and possession of less than four ounces of marijuana
in violation of § 21a-279 (c). See *State* v. *Bischoff*, 182
Conn. App. 563, 568–69, 190 A.3d 137, cert. denied, 330
Conn. 912, 193 A.3d 48 (2018). After the defendant's
arrest but prior to his conviction and sentencing, the
legislature amended § 21a-279 (a), with an effective date
of October 1, 2015, reclassifying a first violation of § 21a-
279 (a) as a misdemeanor punishable by not more than
one year of incarceration. At the defendant's 2016 sen-
tencing, his counsel requested that the trial court sen-
tence him in accordance with the amended version of
§ 21a-279 (a). He argued that the policy underlying the
amendment—providing assistance, not punishment, to
nonviolent drug users—should apply retroactively to
him. The trial court declined this request, merged the
defendant's convictions of possession of heroin and
possession of cocaine into a single conviction of posses-
sion of narcotics, and sentenced him to seven years
of incarceration, suspended after five years, and three
years of probation. As to his conviction of possession
of less than four ounces of marijuana, the trial court
sentenced him to a concurrent term of one year of incar-
ceration.

The defendant appealed from the judgment of convic-
tion to the Appellate Court and, among other things,
renewed his argument that he was entitled to be sen-
tenced on the conviction of possession of narcotics
pursuant to Spec. Sess. P.A. 15-2, § 1, which, he claimed,
applied retroactively to his case. Id., 579. The Appellate
Court rejected the defendant's claim, relying on *State*

State *v.* Bischoff

v. *Moore*, 180 Conn. App. 116, 124, 182 A.3d 696, cert. denied, 329 Conn. 905, 185 A.3d 595 (2018), which held that Spec. Sess. P.A. 15-2, § 1, did not apply retroactively. Id. The defendant petitioned for certification to appeal, which this court denied. See *State* v. *Bischoff*, 330 Conn. 912, 193 A.3d 48 (2018).

The defendant then filed a motion to correct an illegal sentence, the subject of the present appeal, again arguing that the legislature intended Spec. Sess. P.A. 15-2, § 1, to apply retroactively, or, alternatively, that the amelioration doctrine should apply. The trial court dismissed the motion, and the defendant appealed to the Appellate Court, which, in a per curiam opinion, again held that Spec. Sess. P.A. 15-2, § 1, does not apply retroactively, and, like the trial court, rejected application of the amelioration doctrine, ruling that it was bound by this court's holding in *State* v. *Kalil*, supra, 314 Conn. 529.[2] *State* v. *Bischoff*, 189 Conn. App. 119, 121–22, 206 A.3d 253 (2019). The defendant petitioned this court for certification to appeal, which we granted, limited to the following issues: (1) "Did the Appellate Court properly determine, in *State* v. *Moore*, [supra, 180 Conn. App. 116] that [Spec. Sess. P.A. 15-2, § 1], does not have retroactive effect?" And (2) "[i]f the answer to the first certified question is '[yes],' should this court overrule the retroactivity analysis contained in *State* v. *Kalil*, [supra, 314 Conn. 552] and apply the amelioration doctrine to give retroactive effect to Spec. Sess. P.A. 15-2, § 1?"[3] *State* v. *Bischoff*, 331 Conn. 926, 926–27, 207 A.3d 28 (2019).

---

[2] The Appellate Court ruled that the form of the trial court's judgment was improper and that the trial court should have denied, not dismissed, the defendant's motion. See *State* v. *Bischoff*, 189 Conn. App. 119, 120, 124, 207 A.3d 28 (2019).

[3] Due to a scrivener's error, which we correct in brackets, the second certified question initially stated: "If the answer to the first certified question is 'no,' should this court overrule the retroactivity analysis contained in *State* v. *Kalil*, [supra, 314 Conn. 552] and apply the amelioration doctrine to give retroactive effect to Spec. Sess. P.A. 15-2, § 1?" *State* v. *Bischoff*, 331 Conn. 926, 927, 207 A.3d 28 (2019).

State *v.* Bischoff

Although "[a] claim that the trial court improperly denied a defendant's motion to correct an illegal sentence is [typically] reviewed pursuant to the abuse of discretion standard"; (internal quotation marks omitted) *State* v. *Brown*, 310 Conn. 693, 701–702, 80 A.3d 878 (2013); in the present case, the defendant's motion to correct an illegal sentence raises two questions of law, over which our review is plenary: (1) whether the trial court properly construed Spec. Sess. P.A. 15-2, § 1, not to apply retroactively; see *Walsh* v. *Jodoin*, 283 Conn. 187, 195, 925 A.2d 1086 (2007); and (2) whether this court should overrule *Kalil* and recognize the amelioration doctrine. See, e.g., *State* v. *Ashby*, 336 Conn. 452, 492, 247 A.3d 521 (2020).

I

The defendant first claims that we must interpret Spec. Sess. P.A. 15-2, § 1, to apply retroactively. The defendant concedes that the plain language of Spec. Sess. P.A. 15-2, § 1, does not mention retroactivity. He asserts that the legislature enacted P.A. 15-244, a budget bill, under the impression that Spec. Sess. P.A. 15-2, § 1, a budget implementing bill, would reduce the prison population and save the Department of Correction (department) millions of dollars. The defendant argues that, if Spec. Sess. P.A. 15-2, § 1, is not applied retroactively, the department would not attain those savings, an absurd and unworkable result that would violate the legislature's constitutional duty to pass a balanced budget. See Conn. Const., amend. XXVIII (codified at Conn. Const., art. III, § 18 (a)). As a result, he contends, this court must examine relevant extratextual sources, including a fiscal note authored by the Office of Fiscal Analysis showing that the legislature intended Spec. Sess. P.A. 15-2, § 1, to apply retroactively. See Office of Fiscal Analysis, Connecticut General Assembly, Fiscal Note, House Bill No. 7104, An Act Implementing Provisions of the State Budget for the Biennium Ending June

State *v.* Bischoff

30, 2017 Concerning General Government Provisions Relating to Criminal Justice.

In response, the state contends that the Appellate Court—in *Moore*, in the defendant's direct appeal, and in the present case—correctly determined that, in the absence of explicit language regarding retroactivity, Spec. Sess. P.A. 15-2, § 1, is presumed to apply only prospectively, i.e., only to cases brought after its effective date. The state argues that a prospective application would not lead to an absurd or unworkable result when Spec. Sess. P.A. 15-2, § 1, is viewed in the context of the relevant savings statutes, General Statutes §§ 1-1 (t) and 54-194. We agree with the state.

A criminal "statute is said to have retroactive application if it applies to crimes allegedly committed prior to its date of enactment. . . . The question is one of legislative intent and is governed by well established rules of statutory construction." (Citations omitted.) *State* v. *Nathaniel S.*, 323 Conn. 290, 294, 146 A.3d 988 (2016). Specifically, "to ascertain and give effect to the apparent intent of the legislature . . . General Statutes § 1-2z directs this court to first consider the text of the statute and its relationship to other statutes to determine its meaning. If, after such consideration, the meaning is plain and unambiguous and does not yield absurd or unworkable results, we shall not consider extratextual evidence of the meaning of the statute. . . . Only if we determine that the statute is not plain and unambiguous or yields absurd or unworkable results may we consider extratextual evidence of its meaning such as the legislative history and circumstances surrounding its enactment . . . [and] the legislative policy it was designed to implement . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citations omitted; footnote omitted; internal

State *v.* Bischoff

quotation marks omitted.) *Marchesi* v. *Board of Select-men*, 309 Conn. 608, 614–15, 72 A.3d 394 (2013).

We therefore begin our analysis with the language of Spec. Sess. P.A. 15-2, § 1, the first clause of which provides: "Section 21a-279 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2015*) . . . ." (Emphasis in original.) Spec. Sess. P.A. 15-2, was passed on June 20, 2015, and § 1 is silent on whether it applies retroactively. The effective date of Spec. Sess. P.A. 15-2, § 1, October 1, 2015, is therefore the only textual reference to the date of applicability found in Spec. Sess. P.A. 15-2, § 1, and indicates that the change in punishment for violating § 21a-279 would take effect months after its enactment, not retroactively.

The defendant counters that this court may not treat the effective date as dispositive of the legislature's intent regarding retroactivity.[4] We agree and do not rely

[4] The defendant argues that courts recently have placed too much significance on the effective date in determining retroactivity, treating it as dispositive. See *State* v. *Kalil*, supra, 314 Conn. 558 ("[T]he effective date of [Public Acts 2009, No. 09-138, § 2 (P.A. 09-138)], was October 1, 2009. This fact, and the absence of any express language in the provision referring to its retroactive application, indicates that the legislature intended P.A. 09-138, § 2, to be applied prospectively only."); *State* v. *Moore*, supra, 180 Conn. App. 123 ("The effective date of the 2015 amendment is October 1, 2015. . . . The amendment contains no express statement that it applies retroactively. . . . [T]he absence of any language stating that the amendment applies retroactively indicates that the legislature intended the amendment to apply prospectively only." (Citation omitted.)). He points out that, in *State* v. *Nathaniel S.*, supra, 323 Conn. 301, this court held that the effective date had no " 'particular significance' " in determining retroactivity.

There is a critical difference between Spec. Sess. P.A. 15-2, § 1, and the amendatory act we construed in *State* v. *Nathaniel S.*, supra, 323 Conn. 294–96. *Nathaniel S.* involved an amendment to the juvenile transfer statute that increased the age of a child whose case was subject to an automatic transfer to the adult docket by one year to fifteen years old. Id., 292; see Public Acts 2015, No. 15-183, § 1 (P.A. 15-183), codified at General Statutes (Supp. 2016) § 46b-127 (a) (1). The issue in *Nathaniel S.* was whether the presumption against retroactivity under General Statutes § 55-3, which applies only to substantive changes in the law, applied to the juvenile transfer amendment. We concluded that the amendment to the automatic transfer

State *v.* Bischoff

on the act's effective date as the only relevant textual evidence of the legislature's intent regarding retroactivity. The courts in *Kalil* and *Moore* did not, either. Rather, we consider the effective date in light of the applicable savings statutes and the legislature's lack of any reference to retroactivity.

Section 1-2z directs that "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself *and its relationship to other statutes.*" (Emphasis added.) Because Spec. Sess. P.A. 15-2, § 1, repealed and replaced[5] the penalty structure for

provisions was procedural in nature, which, under our case law, unlike a substantive amendment, is presumed to apply retroactively to all pending cases. *State* v. *Nathaniel S.*, supra, 301. It was in light of that presumption that the court stated that the effective date of P.A. 15-183 was of no " 'particular significance' ": i.e., the effective date of the repealing statute did not overcome the presumption of retroactivity. Id.

By contrast, the amendment at issue in the present case changes the punishment structure for the crime of possession of narcotics, thereby implicating §§ 54-194 and 1-1 (t), which apply to changes to criminal statutes prescribing punishment and create a presumption against retroactivity. The defendant does not contend that we are tasked with deciding whether Spec. Sess. P.A. 15-2, § 1, is substantive or procedural under § 55-3. Thus, unlike in *Nathaniel S.*, in which the defendant sought to use an effective date to *rebut* an applicable presumption, the effective date of Spec. Sess. P.A. 15-2, § 1, *buttresses* the presumption of prospective application only.

[5] In enacting amendments—ameliorative or otherwise—our legislature explicitly repeals the prior version of the amended statute. Connecticut may be unique in this respect. Thus, this court consistently has held, and the defendant does not contest, that amendments and substitutions to statutes are the equivalent of repeals, and, thus, the savings statutes apply to any change—amendment, substitution, or repeal—to a criminal statute prescribing or defining punishment. See *Simborski* v. *Wheeler*, 121 Conn. 195, 200, 183 A. 688 (1936) (amendment or substitution "constitutes just as complete and effective a repeal of the provisions in the place of which the substitution is made as though they had been in terms repealed"); see also *State* v. *Kalil*, supra, 314 Conn. 553 n.9 (difference between repeal and amendment "is a distinction without a difference, because the legislature typically repeals an existing statute before enacting its replacement containing the amended language"). Thus, there is no dispute in the present case that the legislature "repealed" the existing possession of narcotics statute in its entirety before replacing it with the new sentencing scheme. See Spec. Sess. P.A. 15-2, § 1 ("[s]ection 21a-279 of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2015)" (emphasis omitted)).

State *v.* Bischoff

the crime of possession of narcotics, the state argues that §§ 54-194 and 1-1 (t), two of our savings statutes, are related statutes for statutory construction purposes, and, thus, our interpretation of Spec. Sess. P.A. 15-2, § 1, is controlled by their presumption against retroactivity. We agree.

The plain language of § 54-194 provides that "[t]he repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect." Section 1-1 (t) provides that "[t]he repeal of an act shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or any suit, or prosecution, or proceeding pending at the time of the repeal, for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed."

This court has interpreted these statutes to mean that there is a presumption that changes to criminal statutes prescribing or defining punishment apply prospectively only, unless the statute expressly states otherwise. See *State* v. *Kalil*, supra, 314 Conn. 552 (presumption that criminal statutes apply prospectively is derived from §§ 54-194 and 1-1 (t)). This presumption "can be overcome only by a clear and unequivocal expression of legislative intent that the statute shall apply retrospectively . . . [which may be determined by examining the language of the statute and] the relationship of [the statute] to related statutes . . . ." (Citation omitted.) *Mead* v. *Commissioner of Correction*, 282 Conn. 317, 325, 920 A.2d 301 (2007); see also *State* v. *Nowell*, 262 Conn. 686, 701–702, 817 A.2d 76 (2003).[6]

--------

[6] An example of the legislature's expressly providing for retroactive applicability is No. 11-51 of the 2011 Public Acts, § 22, codified at General Statutes § 18-98e (a), which provides in relevant part that "any person sentenced to a term of imprisonment for a crime committed on or after October 1, 1994, and committed to the custody of the Commissioner of Correction on or

State *v.* Bischoff

As noted, the defendant does not contend that the plain language of Spec. Sess. P.A. 15-2, § 1, clearly overcomes this presumption. Rather, he argues that this presumption does not apply in the present case because the legislature did not intend for these savings statutes to apply to ameliorative changes to sentencing schemes, and, thus, these statutes are not in fact related statutes for statutory construction purposes in determining the meaning of Spec. Sess. P.A. 15-2, § 1.[7] Specifically, the defendant argues that §§ 54-194 and 1-1 (t) do not apply to Spec. Sess. P.A. 15-2, § 1, because, historically, these savings statutes were adopted to prevent common-law abatement, not to prevent a defendant from receiving the benefit of an ameliorative statute.

It is true that these savings statutes were enacted "to counter the effect of the common-law abatement doctrine." *State* v. *Kalil*, supra, 314 Conn. 556. The history of the statutes, however, does not support an argument that the legislature intended to exclude ameliorative amendments from the presumption against retroactivity derived from §§ 54-194 and 1-1 (t)).

We refer to these statutes as "savings statutes" because they "preserve all prior offenses and liability therefor so that when a crime is committed and the statute violated is later amended or repealed, defendants remain liable under the revision of the statute existing at the time of the commission of the crime. . . . [S]avings statutes were enacted to prevent defendants

---

after said date . . . may be eligible to earn risk reduction credit toward a reduction of such person's sentence, in an amount not to exceed five days per month, at the discretion of the Commissioner of Correction for conduct as provided in subsection (b) of this section occurring on or after April 1, 2006." This amendment specifically provided that it retroactively applied to inmates who committed crimes on or after October 1, 1994.

[7] The defendant makes this argument in his initial brief in relation to his second claim, regarding the amelioration doctrine, and in his reply brief in relation to his first claim in response to the state's argument regarding the proper construction of Spec. Sess. P.A. 15-2, § 1. For efficiency, we address this argument here.

State *v.* Bischoff

from escaping punishment by allowing the state to pursue them under prior versions of a statute, regardless of whether the newer revision imposed a greater or lesser penalty.'' (Citations omitted.) *State* v. *Graham*, 56 Conn. App. 507, 511, 743 A.2d 1158 (2000). ''At common law, the repeal of a criminal statute abated all prosecutions which had not reached final disposition in the highest court authorized to review them. . . . Abatement by repeal included a statute's repeal and [reenactment] with different penalties. . . . And the rule applied even when the penalty was reduced. . . . To avoid such results, legislatures frequently indicated an intention not to abate pending prosecutions by including in the repealing statute a specific clause stating that prosecutions of offenses under the repealed statute were not to be abated.'' (Citations omitted.) *Bradley* v. *United States*, 410 U.S. 605, 607–608, 93 S. Ct. 1151, 35 L. Ed. 2d 528 (1973). ''As a way of preventing abatements of criminal prosecutions and other liabilities when legislatures failed to provide special savings clauses in the repealing legislation, state legislatures began in the [nineteenth] century to adopt general savings statutes applicable thereafter to all repeals, amendments, and reenactments of criminal and civil liabilities. For criminal prosecutions, therefore, these statutes shifted the legislative presumption from one of abatement unless otherwise specified to one of [nonabatement] in the absence of contrary legislative direction.'' (Footnote omitted; internal quotation marks omitted.) *Holiday* v. *United States*, 683 A.2d 61, 66 (D.C. 1996), cert. denied sub nom. *Palmer* v. *United States*, 520 U.S. 1162, 117 S. Ct. 1349, 137 L. Ed. 2d 506 (1997).

To the extent that the history of the savings statutes leaves any ambiguity as to their applicability, this court's interpretation of these statutes lays to rest any doubt. Since at least 1936, this court has held that changes to criminal sentencing schemes, even those that provide a benefit to defendants, are subject to these

State *v.* Bischoff

savings statutes. See *Simborski* v. *Wheeler*, 121 Conn. 195, 183 A. 688 (1936) (applying statutory predecessor to § 54-194 when amendments to method of carrying out death penalty would have benefited defendant).[8] This is due to the language of § 54-194, which provides in relevant part that it applies to "[t]he repeal of *any* statute defining or prescribing the punishment for any crime. . . ." (Emphasis added.) On the basis of this language, courts in this state have concluded that "[i]t is obvious from the clear, unambiguous, plain language of the savings statutes that the legislature intended that the defendant be prosecuted and sentenced in accordance with and pursuant to the statutes in effect at the time of the commission of the crime . . . regardless of whether the newer revision imposed a greater or lesser penalty." (Citations omitted.) *State* v. *Graham*, supra, 56 Conn. App. 511, citing *Simborski* v. *Wheeler*, supra, 198–200.

---

[8] The concurring justice disagrees that "our earlier case law suggests that the outcome in *Kalil* was foreordained by 'extensive case law' . . . ." Footnote 2 of the concurring opinion. Specifically, it does not view our prior case law as ever having decided "the question of whether the amelioration doctrine could or should be adopted as part of our laws . . . ." Id. Although this court may not have used the word "amelioration," our prior case law clearly has addressed whether changes to criminal statutes defining or prescribing punishment that provide a benefit to defendants apply retroactively under §§ 54-194 and 1-1 (t), which is the same issue in different verbiage. It is also true that, in *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 16 A.3d 676 (2011), we stated that "[t]his court has not previously held that ameliorative changes to criminal statutes apply retroactively and we express no opinion on that question here." Id. 663 n.14. But that statement related to General Statutes § 55-3, which is the savings statute governing substantive changes to laws in general, not §§ 54-194 and 1-1 (t), which apply specifically to changes in laws that define or prescribe punishment. See *Harlow* v. *Planning & Zoning Commission*, 194 Conn. 187, 194, 479 A.2d 808 (1984) (§ 55-3 embodies general presumption that legislation is intended to operate prospectively). Moreover, the *Castonguay* footnote is consistent with our prior law, as this court *never* has "held that ameliorative changes to criminal statutes *apply* retroactively . . . ." (Emphasis added.) *Castonguay* v. *Commissioner of Correction*, supra, 663 n.14. On the other hand, we specifically *have* held that changes to criminal statutes that benefit defendants *do not apply* retroactively in the absence of a clear intent from the legislature.

State *v.* Bischoff

In light of this plain language and history, this court consistently has held that these savings statutes embody a legislative intent of only prospective application of changes to criminal statutes defining or prescribing punishment, unless otherwise specified explicitly, regardless of whether the change benefits defendants. See *State* v. *Kalil*, supra, 314 Conn. 552 (holding that §§ 54-194 and 1-1 (t) apply to changes to sentencing schemes of criminal statutes, even those that benefit defendant); *State* v. *Harris*, 198 Conn. 158, 168, 502 A.2d 880 (1985) (rejecting defendant's argument that he should not be prosecuted under statute in effect at time of crime but under amended statute, and stating that, "[i]n order to accept the defendant's argument . . . [the court] would have to ignore the savings clause embodied in . . . § 54-194"); *State* v. *Carbone*, 172 Conn. 242, 256, 374 A.2d 215 (repeal of statute was not retroactive "[s]ince the defendants were liable to prosecution at the date of the repeal, [and, thus] § 54-194 preserves that liability"), cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977), and cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); *State* v. *DeMartin*, 171 Conn. 524, 528–29, 370 A.2d 1038 (1976) (in determining whether amended statute applies, "§ 54-194 is dispositive" that "a crime committed prior to the effective date of the repealing act remains punishable under the terms of the prior statute" unless amended statute expressly provides otherwise (internal quotation marks omitted)); *State* v. *Pastet*, 169 Conn. 13, 22, 363 A.2d 41 (§ 1-1 (t) applied to repeal of sentencing statute, and, thus, repeal was not retroactive), cert. denied, 423 U.S. 967, 96 S. Ct. 297, 46 L. Ed. 2d 270 (1975); *State* v. *Pastet*, 152 Conn. 81, 85, 203 A.2d 287 (1964) ("[i]n the absence of any expressed legislative intent that [the public act] should apply retroactively, we dismiss this attempt by the defendant [to persuade the court otherwise] without further comment"), citing General Statutes §§ 1-1 (t) and 54-194;

State *v.* Bischoff

*Dortch* v. *State*, 142 Conn. 18, 29, 110 A.2d 471 (1954) (savings statutes applied to change to criminal sentencing scheme and prevented retroactive application when ''[t]he legislature expressed no intent that [the amended statute] should operate retrospectively''); *Simborski* v. *Wheeler*, supra, 121 Conn. 197–98, 199 (The court applied the statutory predecessor to § 54-194 when amendments that changed the method of carrying out the death penalty would have benefited the defendant because ''[t]he situation before [the court was] clearly within the intent of . . . provisions [the legislature previously had enacted pertaining to the repeal of statutes]. In effect they attach to every act repealing a statute within their purview a saving clause . . . under which the repealed statute still remains in full effect as regards any matter covered by it.'').[9]

On the basis of this extensive case law, dating back to the 1930s, we must assume that the legislature is aware of how we have interpreted and applied §§ 54-194 and 1-1 (t).[10] The legislature has not amended these savings

---

[9] Despite our lengthy history of applying these savings statutes to all changes to criminal statutes prescribing punishment, the defendant relies on a footnote from *State* v. *Nathaniel S.*, supra, 323 Conn. 290, for his contention that there remains an open question regarding whether the savings statutes would bar retroactive application of a change to a criminal statute that benefits a defendant. We said in that case: ''Because we conclude that [the amendment at issue] is procedural rather than substantive, we need not determine whether [General Statutes] § 55-3 would bar retroactive application of a statute that, while substantive in nature, affords only benefits to a criminal defendant and imposes no new obligations on either the defendant or other persons.'' (Emphasis omitted.) Id., 295 n.1. Not only is the footnote in *Nathaniel S.* nonbinding dictum, as already discussed, it involves a different savings statute than either of the statutes at issue in this case. See footnote 4 of this opinion. As also already discussed, this court has a long history of applying §§ 54-194 and 1-1 (t) to any amendment that involves the defining or prescribing of punishment, regardless of whether the amendment increases or decreases punishment.

[10] The defendant argues that this court should interpret its savings statutes in a manner similar to how courts in other jurisdictions have interpreted their savings statutes as not applying to ameliorative changes to sentencing schemes. But as this court previously has stated, ''[b]ecause of the differences in the statutory language, governing statutory regimes, and controlling

State *v.* Bischoff

statutes, manifesting its acceptance of our interpretation of them. See *State* v. *Kalil*, supra, 314 Conn. 556 (legislature has not amended §§ 54-194 and 1-1 (t) for more than 130 years); see also *State* v. *Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 440, 54 A.3d 1005 (2012) ("[o]nce an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision" (internal quotation marks omitted)).[11] Thus, §§ 54-194 and 1-1 (t) apply to any change to a

legal precedents, those decisions are of limited use in construing the intent of the Connecticut legislature . . . ." *State* v. *Nathaniel S.*, supra, 323 Conn. 301.

[11] The defendant responds that, pursuant to *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), we cannot presume legislative acquiescence unless the legislature has amended these statutes to adopt explicitly this court's interpretation of them. See id., 521–22 ("We also have recognized that legislative inaction [following our interpretation of a statute] is not necessarily legislative affirmation . . . . [T]he legislature's failure to amend a statute in response to our interpretation of that provision is not dispositive of the issue because legislative inaction is not always the best of guides to legislative intent." (Citations omitted; internal quotation marks omitted.); id., 525 (legislative acquiescence is strongest when legislature has amended statute at issue in response to judicial interpretation but did not amend portion at issue, despite judicial interpretation).

The defendant misapplies our holding in *Salamon*. In *Salamon*, this court did not hold that legislative inaction cannot be considered in determining legislative intent but, rather, held that legislative inaction did not *establish* the legislature's intention regarding this state's kidnapping statute, as "the issue presented by the defendant's claim is not one that is likely to have reached the top of the legislative agenda because the issue directly implicates only a relatively narrow category of criminal cases"; id., 523; and because the statutory section at issue had not been subject to any amendment since 1969. Id., 525–56.

The present case is distinguishable from *Salamon* because the issue of whether §§ 54-194 and 1-1 (t) apply to all changes to criminal statutes prescribing punishment *is* an issue "likely to have reached the top of the legislative agenda"; id., 523; for the following reasons: this court's interpretation of §§ 54-194 and 1-1 (t) dates back to at least the 1930s; this court has addressed this issue previously on numerous occasions; and our prior interpretation of these statutes has had broad impact, implicating any criminal case involving a sentencing scheme that the legislature has amended.

State *v.* Bischoff

criminal statute prescribing or defining punishment and are related statutes for purposes of interpreting Spec. Sess. P.A. 15-2, § 1.

Additionally, because we must assume that the legislature is aware that we have interpreted §§ 54-194 and 1-1 (t) as requiring an explicit expression of intent regarding retroactivity to overcome this presumption, we likewise must assume that the legislature's silence regarding retroactivity in Spec. Sess. P.A. 15-2, § 1, is evidence of an intent for prospective application only. Specifically, in light of our well established interpretation of §§ 54-194 and 1-1 (t), the fact that Spec. Sess. P.A. 15-2, § 1, is silent regarding retroactivity does not create ambiguity. See *State* v. *Orr*, 291 Conn. 642, 653–54, 969 A.2d 750 (2009) ("[t]he fact that . . . relevant statutory provisions are silent . . . does not mean that they are ambiguous" (internal quotation marks omitted)). Rather, this silence "indicates that the legislature intended [the amendment] to be applied prospectively only." *State* v. *Kalil*, supra, 314 Conn. 558; see also *State* v. *Harris*, supra, 198 Conn. 168 (because we must presume that legislature was aware of savings statute, and related case law, we also must presume that it did not intend for amendment at issue to apply retroactively when amendment made no mention of retroactive application). Accordingly, Spec. Sess. P.A. 15-2, § 1, is subject to only one reasonable interpretation—that it applies only prospectively.

Moreover, the straightforward rule created by these savings statutes—that changes to the sentencing scheme of a criminal statute are not retroactive unless explicitly stated—is supported by the legislature's directive in § 1-2z that we ascertain the meaning of a statute "in the first instance . . . from the text of the statute itself and its relationship to other statutes." This rule also makes for sound policy because, by requiring the legislature to be explicit regarding retroactivity,

State *v.* Bischoff

these savings statutes help eliminate the possibility of ambiguity regarding an amendment's applicability, an issue inherent in any amendment altering criminal penalties that could be resolved by legislative clarity rather than judicial interpretation.

Nevertheless, the defendant asserts that we must consider Spec. Sess. P.A. 15-2, § 1, in the context of not only the savings statutes, but also in light of P.A. 15-244, the budget bill he claims it was meant to implement. He argues that, even if it is assumed that the text of the amendment and its relationship to the savings statutes yield a plain and unambiguous meaning requiring prospective application only, this reading leads to an "absurd and unworkable result." The crux of the defendant's argument is that P.A. 15-244 anticipated a certain amount of fiscal savings for the department, which was supposed to be accomplished by Spec. Sess. P.A. 15-2, § 1, and, without retroactive application, Spec. Sess. P.A. 15-2, § 1, cannot accomplish its purpose, thereby creating an unbalanced budget in violation of the legislature's constitutional duty to pass a balanced budget. See Conn. Const., amend. XXVIII. As a result, the defendant contends, this court may examine extratextual sources to determine the legislature's intent, including a fiscal note authored by the Office of Fiscal Analysis regarding Spec. Sess. P.A. 15-2, § 1. See Office of Fiscal Analysis, Fiscal Note, House Bill No. 7104, supra. The defendant maintains that the fiscal note shows that the legislature intended the amendment to apply retroactively because the legislature anticipated that it would lead to a certain amount of savings for the department, which would have been possible only if the amendment were to be applied retroactively to those defendants with pending cases at the time the amendment became effective.

The defendant correctly notes that, even if the language of Spec. Sess. P.A. 15-2, § 1, is plain and unambiguous, extratextual sources may be consulted if "the

State *v.* Bischoff

meaning of a provision cannot be gleaned from examining the text of the statute and other related statutes without yielding an absurd or unworkable result . . . .'' *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 129 n.16, 848 A.2d 451 (2004); see also *State* v. *Salamon*, 287 Conn. 509, 524–25, 949 A.2d 1092 (2008). ''[T]his court will not interpret statutes in such a way that would reach a bizarre or absurd result.'' (Internal quotation marks omitted.) *State* v. *Boyd*, 272 Conn. 72, 79, 861 A.2d 1155 (2004). The plain language of P.A. 15-244, however, does not support the defendant's argument. Nothing in P.A. 15-244 or its legislative history references Spec. Sess. P.A. 15-2, § 1, let alone a specific amount of fiscal savings anticipated by Spec. Sess. P.A. 15-2, § 1. This is not surprising because P.A. 15-244 was passed by the legislature before Spec. Sess. P.A 15-2.

Rather, to establish that the legislature intended Spec. Sess. P.A. 15-2, § 1, to create a certain amount of fiscal savings that would be possible through retroactive application only, the defendant makes a circular argument, relying on extratextual sources to show that a prospective only application would lead to the absurd result of *not* achieving those savings, thereby justifying the use of the same extratextual sources in interpreting Spec. Sess. P.A. 15-2, § 1.[12] The defendant argues that we may examine these extratextual sources to determine whether there is an absurd or unworkable result insofar as budget bills and associated implementing bills ''are

_____

[12] Specifically, the defendant relies on the fiscal note authored by the Office of Fiscal Analysis attached to Spec. Sess. P.A. 15-2, § 1, which provides in relevant part: ''The bill [Spec. Sess. P.A. 15-2, § 1] makes various changes to statutes regarding drug possession that implement P.A. 15-244. The changes result in an estimated savings to the [d]epartment . . . of $6.6 million in [fiscal year 2016] and at least $12.4 million in [fiscal year 2017] through reduction in prison population and corresponding facility closures. However, P.A. 15-244 includes a higher savings target of $ 12.5 million in [fiscal year 2016] and $18.9 million in [fiscal year 2017] in the [d]epartment . . . .''

State *v.* Bischoff

unique forms of legislation because they cannot be fully
understood on their own. Unlike the plain language
contained within other statutes, budget bills are com-
prised of fiscal amounts and budget line items—num-
bers—that are not self-explanatory. Indeed, these bills
can only be fully understood and acted upon by refer-
ence to documents prepared by the legislature's nonpar-
tisan office, the Office of Fiscal Analysis . . .
[including fiscal notes] and any implementing legisla-
tion the legislature chooses to pass to effectuate the
revenue and expenditure levels contained in the bud-
get.'' Thus, the defendant contends that we must con-
sider Spec. Sess. P.A. 15-2, § 1, not just in light of P.A.
15-244 but also in light of any related analyses authored
by the Office of Fiscal Analysis.

The defendant cites no case law, and we have found
none, holding that budget bills are inherently ambigu-
ous under § 1-2z and that extratextual sources must be
considered to determine their meaning. Additionally,
the defendant's argument conflicts directly with our
rules of statutory construction, which prohibit this
court from considering extratextual sources unless the
plain language of the statute is ambiguous or leads to
an absurd or unworkable result. See General Statutes
1-2z. In determining whether the plain language of P.A.
Spec. Sess. 15-2, § 1, leads to an absurd or unworkable
result, we are limited to considering its plain language
and its relationship to other statutes. The defendant
has not identified any language in Spec. Sess. P.A. 15-
2, § 1, or P.A. 15-244 that supports his argument. The
only arguable support for his argument exists in extra-
textual sources, such as the fiscal note attached to Spec.
Sess. P.A. 15-2, § 1, which we cannot consider.[13] See

_____

[13] The only reference in the legislative history of P.A. 15-244 to fiscal
savings for the department is a single statement that the budget bill requires
the department to save $5.3 million. See 58 H.R. Proc., Pt. 23, 2015 Sess.,
p. 7858, remarks of Representative Toni E. Walker (''We also had some
savings in our budget. . . . We ended up at approximately 20 million [dol-
lars] . . . . And the way we have it broken down now is 5 million [dollars]

State *v.* Bischoff

*State* v. *Ramos*, 306 Conn. 125, 140–41, 49 A.3d 197
(2012) (''[a]lthough the defendant contends that our
conclusion would mean that legislators whose com-
ments during debate on [a] 1997 amendment indicated
that they interpreted the statute differently and did not
understand the plain meaning of the bill that they either
sponsored or voted in favor of, this argument too
depends on our resort to the legislative history that § 1-
2z bars us from considering [in the absence of ambiguity
or an absurd result]'').

We note, however, that, even if the Office of Fiscal
Analysis made a mistake regarding the retroactive appli-
cation of Spec. Sess. P.A. 15-2, § 1, or a miscalculation
about its anticipated fiscal savings, this alone would
not necessarily lead to an absurd or unworkable result
requiring retroactive application when the legislature
has not expressed any manifest intent for retroactive
application. Not only does neither P.A. 15-244 nor Spec.
Sess. P.A. 15-2, § 1, mention retroactivity, but the legisla-
tive histories of both are void of any discussion regard-
ing retroactivity. See *Mead* v. *Commissioner of
Correction*, supra, 282 Conn. 326 (rejecting retroactive
application of statute when ''review of the legislative
history . . . reveals that it is void of any clear and
unequivocal expression by the legislature for [the stat-
ute] to apply retroactively''). We acknowledge that fis-
cal notes authored by the Office of Fiscal Analysis ''may
bear on the legislature's knowledge of interpretive prob-
lems that could arise from a bill.'' *Butts* v. *Bysiewicz*,
298 Conn. 665, 688 n.22, 5 A.3d 932 (2010). But they
''are not, in and of themselves, evidence of legislative

---

for the Department of Developmental Services, 5.3 million [dollars] for the
. . . Department [of Correction], and then we have given the responsibility
to the Secretary of [the] Office of [Policy and Management] to achieve
another . . . 10 million [dollars] from the other collective agencies.''). There
is no mention in the legislative history of how these savings will occur,
and it differs from the savings anticipated in the fiscal note relied on by
the defendant.

State *v.* Bischoff

intent . . . .'' Id. The fiscal note at issue, by itself, is insufficient. Sections 54-194 and 1-1 (t) require an explicit expression of intent regarding retroactivity to overcome the presumption of prospective applicability only. Accordingly, viewing the plain language of Spec. Sess. P.A. 15-2, § 1, in the context of P.A. 15-244 does not lead to an absurd or unworkable result, and, thus, extratextual sources may not be considered.

Nevertheless, the defendant responds that it is illogical for the legislature to change the sentencing scheme on the basis of a change in moral policy and a recognition that the prior punishment was ineffective but not to apply that change retroactively. This argument, however, relies on legislative history, which we may not examine in light of our conclusion that the plain language of Spec. Sess. P.A. 15-2, § 1, is clear and unambiguous, and does not lead to an absurd or unworkable result. See *State* v. *Ramos*, supra, 306 Conn. 140. More fundamentally though, this court has stated that there is ''nothing irrational in a legislative conclusion that individuals should be punished in accordance with the sanctions in effect at the time the offense was committed, a viewpoint encompassed by the savings statutes themselves.'' (Internal quotation marks omitted.) *State* v. *Kalil*, supra, 314 Conn. 555, quoting *Holiday* v. *United States*, supra, 683 A.2d 79. It also is perfectly rational for the legislature to conclude that the better policy is to offer statutory grace and apply the change retroactively to pending cases, or even to already sentenced defendants. According to its own words, along with our case law, however, the legislature must do so explicitly.

Accordingly, we conclude that the plain language of Spec. Sess. P.A. 15-2, § 1, clearly and unambiguously prohibits retroactive application, and this interpretation does not lead to an absurd or unworkable result, especially when viewed in context of the related savings statutes, §§ 54-194 and 1-1 (t). Therefore, we conclude

State *v.* Bischoff

that the Appellate Court correctly determined that the defendant was properly sentenced in accordance with the version of § 21a-279 (a) in effect on the date of the conduct at issue.

II

Alternatively, the defendant asks us to declare that Spec. Sess. P.A. 15-2, § 1, applies retroactively under the amelioration doctrine, which "provides that amendments to statutes that lessen their penalties are applied retroactively . . . ." (Internal quotation marks omitted.) *State* v. *Kalil*, supra, 314 Conn. 552. The defendant acknowledges that this court only recently rejected the applicability of this doctrine in *Kalil*. Nonetheless, he argues that we should overrule *Kalil* because it is at odds with this court's long-standing retroactivity precedent.[14] The state responds that this court's holding in *Kalil* is supported by both the applicable savings statutes and § 1-2z, and that no grounds exist for overruling *Kalil*. We agree with the state.

Our determination of whether we should overrule a prior decision is guided by the doctrine of stare decisis, which "counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . [I]n evaluating the force of stare decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the

_____

[14] The defendant also argues that *Kalil*'s prohibition against applying the amelioration doctrine does not apply to the present case because Spec. Sess. P.A. 15-2, § 1, is distinguishable from the statute at issue in *Kalil* in that Spec. Sess. P.A. 15-2, § 1, directly interacts with the budget bill that it was meant to implement, and, thus, not applying this doctrine would lead to an absurd and unworkable result. As explained in part I of this opinion, prospective only application of Spec. Sess. P.A. 15-2, § 1, does not lead to an absurd or unworkable result in light of P.A. 15-244, and, thus, we reject this argument.

State *v.* Bischoff

legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. . . . Once [we have construed a statute and] an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision. . . . Factors that may justify overruling a prior decision interpreting a statutory provision include intervening developments in the law, the potential for unconscionable results, the potential for irreconcilable conflicts and difficulty in applying the interpretation.'' (Internal quotation marks omitted.) *State* v. *Evans*, 329 Conn. 770, 804–805, 189 A.3d 1184 (2018), cert. denied, U.S. , 139 S. Ct. 1304, 203 L. Ed. 2d 425 (2019).

In *Kalil*, the defendant argued that Public Acts 2009, No. 09-138, § 2 (P.A. 09-138), which increased the minimum value element of the second degree larceny statute from $5000 to $10,000, and which would have resulted in a downgrade of the defendant's second degree larceny charge to third degree larceny and a reduction in his sentence, applied retroactively under the amelioration doctrine. *State* v. *Kalil*, supra, 314 Conn. 550. P.A. 09-138, § 2, was enacted after the criminal conduct at issue but while the defendant's case was pending. Id., 551. In declining to adopt the amelioration doctrine, this court noted that, in determining whether a change in a criminal statute prescribing punishment applies retroactively, it is bound by the presumption against retroactivity contained in §§ 54-194 and 1-1 (t). Id., 552–53. Nevertheless, the defendant in *Kalil* argued that the amelioration doctrine should apply despite these savings statutes because the legislature did not intend for §§ 54-194 and 1-1 (t) to apply to ameliorative changes in law. Id., 556. This court disagreed. Id. First, as

State *v.* Bischoff

explained in detail in part I of this opinion, this court set forth its extensive history of holding that these savings statutes apply to all changes to criminal statutes defining or prescribing punishment, even if the change benefits defendants, unless the legislature explicitly provides otherwise. Id., 553–54. Because "the legislature has not seen fit to amend the statutes in any material respects for more than 130 years," despite this case law, this court held that these savings statutes applied and weighed against adopting the amelioration doctrine. Id., 556.

Second, we held that this court was required to interpret changes to criminal sentencing schemes in light of these savings statutes for separation of powers reasons: "[W]hatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility . . . these are peculiarly questions of legislative policy. . . . Thus, although the rule of separation of governmental powers cannot always be rigidly applied . . . it must be remembered that the constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment and to the judiciary the power to try offenses under these laws and [to] impose punishment within the limits and according to the methods . . . provided." (Citations omitted; internal quotation marks omitted.) Id., 554–55.

Third, this court determined that adopting the amelioration doctrine "could result in the unequal treatment of defendants who commit the [same] crime . . . on the same day but whose trials proceed at a different pace, thus resulting in some defendants being convicted under the law in effect at the time the crime was committed and others under the law enacted following commission of the crime." Id., 555. We concluded that it is "unlikely that the legislature would have intended for two similarly situated offenders to receive . . . dispa-

State *v.* Bischoff

rate treatment solely on the fortuity of when their cases came to trial.'' (Internal quotation marks omitted.) Id., 555–56.

Fourth, in response to the defendant's argument that it would be illogical for the legislature to intend for an ameliorative statute to apply prospectively only, this court explained that there was ''nothing irrational in a legislative conclusion that individuals should be punished in accordance with the sanctions in effect at the time the offense was committed, a viewpoint encompassed by the savings statutes themselves.'' (Internal quotation marks omitted.) Id., 555. Finally, this court rejected the defendant's reliance on case law from other jurisdictions that have adopted the amelioration doctrine, explaining that those jurisdictions relied on ''their own unique state constitutional and jurisdictional constraints.'' Id., 556.

We see no reason why this court should overrule *Kalil*, which thoroughly considered this issue more than six years ago. Although relatively recent, the holding in *Kalil* is premised on approximately 100 years of precedent, during which time the legislature took no action that would suggest any disagreement with our interpretation and application of §§ 54-194 and 1-1 (t). See *State* v. *Evans*, supra, 329 Conn. 806–807. Moreover, the analysis in *Kalil* is consistent with our analysis in part I of this opinion, showing that there are no conflicts or difficulty in applying the holding of *Kalil*. Accordingly, we are not persuaded that any '' 'cogent reasons' '' or '' 'inescapable logic' '' supports a departure from our decision in *Kalil*. Id., 805.

The defendant argues that *Kalil* nevertheless should be overruled because it is at odds with this court's prior precedent regarding retroactivity. Specifically, he argues that, prior to *Kalil*, this court routinely examined extratextual sources to determine the legislature's

State *v.* Bischoff

intent regarding retroactivity regardless of the amendment's plain language, and, thus, *Kalil*'s strict application of § 1-2z is contrary to prior case law.[15] The defendant contends that the holding in *Kalil* means that the savings statutes will always trump legislative intent. He contends that, instead, the savings statutes must yield to legislative intent, which is established in this case by extratextual sources. This argument relies on retroactivity cases decided before the enactment of § 1-2z in which this court considered both the plain language of the amendments and legislative history to determine the legislature's intent. See, e.g., *State* v. *Parra*, 251 Conn. 617, 622–23, 741 A.2d 902 (1999); *In re Daniel H.*, 237 Conn. 364, 376, 678 A.2d 462 (1996).

This court has held that the enactment of § 1-2z did not suggest that the legislature intended to overrule prior cases in which our courts employed methods of statutory interpretation that were inconsistent with § 1-2z. See *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 501, 923 A.2d 657 (2007). This would include prior retroactivity cases. We never have held, however, that all future retroactivity cases also can ignore the dictates of § 1-2z and the principles contained therein. Although the holdings in the cases the defendant cites remain good law, the principles of statutory construction that were used to reach those holdings have been replaced by § 1-2z,[16] which directs us not to examine extratextual

---

[15] The defendant also argues that *Kalil*'s strict application of § 1-2z was contrary to prior case law because it treated the effective date of legislation as dispositive of the legislature's intent regarding retroactivity. We reject this argument for the same reasons we rejected it in part I of this opinion.

[16] In two sentences in his reply brief, the defendant argues that, to the extent that § 1-2z prevents him from relying on extratextual sources to establish legislative intent regarding retroactivity, that statute violates the separation of powers doctrine because "the interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function." We decline to review this claim, which the defendant raised, for the first time, in his reply brief. See, e.g., *State* v. *Devalda*, 306 Conn. 494, 519 n.26, 50 A.3d 882 (2012).

State *v.* Bischoff

sources unless the statute's plain language is ambiguous
or creates an absurd or unworkable result. This does not
mean that the savings statutes trump the legislature's
intent. To the contrary, they require the legislature to
be explicit in its intent regarding retroactivity. As
explained, this court has interpreted §§ 54-194 and 1-1
(t) in this fashion for decades, and the legislature never
has amended them, acquiescing to our interpretation
of the legislature's own rules of construction. See *State*
v. *Graham*, supra, 56 Conn. App. 511 ("[t]he defendant's
request that this court adopt an 'amelioration doctrine,'
whereby amendments to statutes that lessen their pen-
alties are applied retroactively is, in essence, asking this
court to intervene in the legislative process to nullify
by judicial fiat the legislature's savings statutes"). Con-
trary to the defendant's argument that a strict adherence
to § 1-2z conflicts with our retroactivity jurisprudence,
§ 1-2z is consistent with our prior interpretations of
§§ 54-194 and 1-1 (t), which require that the legislature
use explicit—i.e., "plain"—language to express its
intent to apply such a statute retroactively. This rule
of construction is not of "our own making," as the
concurring justice asserts, but of the legislature's mak-
ing. (Emphasis omitted.) Section 1-2z is further evi-
dence of the legislature's intent that its statutes be taken
at face value, and not only supports but requires our
conclusion that, unless explicitly stated otherwise, acts
governed by §§ 54-194 and 1-1 (t) must be presumed to
apply only prospectively.[17]

---

[17] If we were to conclude, as the concurring justice does, that our construc-
tion would "defeat and frustrate the will of the legislature," we would of
course reach a different conclusion or overrule *Kalil*. Statutory construction,
after all, is not a means unto itself but, rather, a process of divining the
legislature's will. Although applying Spec. Sess. P.A. 15-2, § 1, retroactively
or adopting and applying the amelioration doctrine to it might be *consistent*
with the purpose of the amendment—to reverse policies that led to mass
incarceration for mere drug possession and to provide a second chance,
including treatment resources, to drug users—that does not mean such
an application is *required*. Rather, this bipartisan legislation, described by
several legislators as a first step that might require future legislation; see

State *v.* Bischoff

Finally, the defendant argues that the holding in *Kalil* is hostile to the clear legislative purpose of ameliorative amendments because these amendments manifest a shift in society's moral approach to punishment. In support of his position, the defendant relies on case law from other jurisdictions that have adopted the amelioration doctrine for this very reason. This argument is unpersuasive, however, because, as we already have explained in *Kalil*, we are bound by § 1-2z and by our savings statutes, which we consistently have interpreted as applying to ameliorative changes in criminal sentencing schemes. Accordingly, we decline the invitation to overrule *Kalil* and to adopt the amelioration doctrine.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and McDONALD, KAHN and KELLER, Js., concurred.

58 S. Proc., Pt. 12, June, 2015 Spec. Sess., pp. 3547–48, remarks of Senator John A. Kissel (describing amendment as "trying a new path, a new methodology," that might require the legislature "to go back and tweak it and change it"); id., p. 3550, remarks of Senator Gary A. Winfield (although voting in favor of the amendment, "there's more that we need to do"); id., p. 3551, remarks of Senator Catherine C. Osten (this amendment was "a beginning of [our] finally dealing with our ever burgeoning . . . prison population"); id., p. 3552, remarks of Senator Leonard A. Fasano (this amendment was "the tip of the iceberg"); id., p. 3554, remarks of Senator Martin M. Looney ("we'll continue to work on these issues"); could have been the result of a compromise, including with legislators who believed that "individuals should be punished in accordance with the sanctions in effect at the time the offense was committed." (Internal quotation marks omitted.) *State* v. *Kalil*, supra, 314 Conn. 555. Ultimately, though, we do not examine this legislative history for the same reason the majority in *Kalil* did not address legislative history: because the plain language of Spec. Sess. P.A. 15-2, § 1, clearly and unambiguously prohibits retroactive application in light of the presumption of prospective only intent arising not from our holding in *Kalil* but from our savings statutes. Thus, the issue is not whether the amelioration doctrine would be consistent with Spec. Sess. P.A. 15-2, § 1, but whether the amelioration doctrine is consistent with our savings statutes. If we were to adopt the amelioration doctrine, as the defendant requests, it would apply to any amendment to criminal statutes that benefits criminal defendants. The legislative history underlying a single amendment alone does not justify adopting such a broadly applicable doctrine.

State *v.* Bischoff

ECKER, J., concurring in the judgment. In *State* v. *Kalil*, 314 Conn. 529, 107 A.3d 343 (2014), this court held that the principles animating the common-law amelioration doctrine were "in direct contravention" of the applicable Connecticut savings statutes governing the retroactive application of repealed statutes[1] and, therefore, did not permit a sentencing court to confer the benefits of ameliorative legislation on a defendant whose crime predated the ameliorative legislation's effective date, even when the sentencing itself took place after that date. Id., 553; see id., 553–59. Due regard for the policy of stare decisis compels me to concur in the result reached by the majority on the basis of the holding in *Kalil*. I do so reluctantly, however, because I am convinced that *Kalil* was wrongly decided, and I am not enthusiastic about reaffirming its holding.[2] Jus-

_____

[1] See General Statutes § 1-1 (t) ("[t]he repeal of an act shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or any suit, or prosecution, or proceeding pending at the time of the repeal, for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed"); General Statutes § 54-194 ("[t]he repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect").

[2] I disagree with the majority to the extent that its review of our earlier case law suggests that the outcome in *Kalil* was foreordained by "extensive case law" dating back to *Simborski* v. *Wheeler*, 121 Conn. 195, 183 A. 688 (1936). Part I of the majority opinion; id. (opining that prior case law "lays to rest any doubt" regarding applicability of savings statutes). I see no evidence that this court, prior to *Kalil*, ever considered or adjudicated the question of whether the amelioration doctrine could or should be adopted as part of our laws governing the retroactive application of criminal statutes. As of 2011, in fact, we expressly declined to rule on the question when it was directly raised by a petitioner, leaving the issue unresolved. See *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 663 n.14, 16 A.3d 676 (2011) ("[t]his court has not previously held that ameliorative changes to criminal statutes apply retroactively and we express no opinion on that question here"). The Appellate Court rejected the doctrine in *State* v. *Graham*, 56 Conn. App. 507, 511, 743 A.2d 1158 (2000), but provided no analysis of the issue beyond declaring that adoption of the doctrine would

State *v.* Bischoff

tice Eveleigh cogently marshals the arguments why *Kalil* was wrongly decided in his concurring and dissenting opinion in that case, with strong supplemental support provided by case law from other jurisdictions that have persuasively construed their own savings statutes—statutory schemes no different from ours in substance, and motivated by precisely the same policy concerns—to accommodate the amelioration doctrine.[3] See id., 559–70 (*Eveleigh, J.*, concurring and dissenting); see also E. Morrison, "Resurrecting the Amelioration Doctrine: A Call to Action for Courts and Legislatures," 95 B.U. L. Rev. 335, 339 (2015) (arguing that courts and legislatures should adopt amelioration doctrine and follow example set by high courts in New York, California, Minnesota and Michigan, in particular). No purpose is served by repeating or elaborating those arguments here.

If we were writing on a clean slate—that is, if *Kalil* had never been decided—the present case would pro-

improperly "intervene in the legislative process to nullify by judicial fiat the legislature's savings statutes."

[3] See, e.g., *In re Estrada*, 63 Cal. 2d 740, 745, 747–48, 408 P.2d 948, 48 Cal. Rptr. 172 (1965) (noting that general savings statute simply reflected legislature's "intent that an offender of a law that has been repealed or amended should be punished" but did "not directly or indirectly indicate whether [the offender] should be punished under the old law or the new one," and holding that "the [l]egislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply"); *People* v. *Schultz*, 435 Mich. 517, 529, 460 N.W.2d 505 (1990) (general savings statute was intended "to prevent technical abatements from barring actions to enforce criminal liability and thereby excusing offenders from punishment" but was not intended "to save the terms of punishment in effect on the date of offense when an ameliorative amendment was subsequently enacted and the case had not yet reached final disposition before [the state's Supreme] Court"); *People* v. *Oliver*, 1 N.Y.2d 152, 159–60, 134 N.E.2d 197, 151 N.Y.S.2d 367 (1956) (general savings statute, which was intended "to preserve the [s]tate's right to prosecute offenses previously committed under the repealed statute," did not preclude application of "an ameliorative statute [that] takes the form of a reduction of punishment for a particular crime").

State *v.* Bischoff

vide a particularly strong occassion for adoption of the amelioration doctrine in that the legislation at issue was intended to implement precisely the kind of public policy that the amelioration doctrine is designed to promote. The idea underlying the amelioration doctrine is that "[a] legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law." *People* v. *Oliver*, 1 N.Y.2d 152, 160, 134 N.E.2d 197, 151 N.Y.S.2d 367 (1956). With respect to Public Acts, Spec. Sess., June, 2015, No. 15-2 (Spec. Sess. P.A. 15-2), the argument for application of the doctrine is especially compelling because the statutory amendment reflected the legislature's belief that the preexisting, stricter punishment regime supplanted by the ameliorative legislation was not merely *unnecessary* to meet the legitimate ends of the criminal law but was affirmatively *destructive* of those ends. Indeed, as the following discussion illustrates, the fundamental public policy driving the passage of Spec. Sess. P.A. 15-2 was the legislature's determination that the preexisting sentencing regime governing the criminal offenses committed by the defendant, Haji Jhmalah Bischoff, caused ruinous penological results and, by the legislature's own determination, must be torn out by the roots and replaced with a fundamentally different and less punitive model animated by a radically contrasting conception of crime and punishment in the particular context of drug possession. I recount this legislative background to highlight the irony inhering in our decision today, which requires a trial court, in the name of deference to the legislative will, to impose sentence on the defendant under a statutory regime that the legislature itself considers discredited and outmoded, rather than under the new, more enlightened regime enacted by the legislature prior to the defendant's sentencing.[4]

---

[4] The majority states that, because "the plain language of Spec. Sess. P.A. 15-2, § 1, clearly and unambiguously prohibits retroactive application," we

State *v.* Bischoff

Section 1 of Spec. Sess. P.A. 15-2 was passed as part of a large-scale criminal justice reform effort known as the Second Chance Society initiative, which aimed to reverse policies that had led to mass incarceration and sought to treat rather than to punish drug users.[5] Representative William Tong, who introduced the legislation in the House during the regular legislative session, explained that incarcerating individuals for mere drug possession had not "accomplished our goal of eradicating drug abuse and drug addiction." 58 H.R. Proc., Pt. 24, 2015 Sess., p. 8100. Instead, "we have sent generations of young men, predominantly from our cities, to jail." Id. Representative Tong explained that the bill constituted a landmark shift in public policy that "fundamentally remakes our criminal justice system and our drug policy . . . ." Id., p. 8097. He also denounced the state's former strategy of mass incarceration of nonviolent drug possessors: "[W]e want to be smarter on crime, and we know that creating a generation of felons and a strategy of mass incarceration of people for simple possession just isn't working." 58 H.R. Proc., Pt. 25, June, 2015 Sess., pp. 8488–89. Representative

have no need even to examine this legislative history. Part I of the majority opinion. As the majority acknowledges elsewhere in its opinion, Spec. Sess. P.A. 15-2 is silent on the question of retroactivity, and the meaning of that silence only becomes "unambiguous" in light of the presumption of a prospective only intent arising from our holding in *Kalil*. I agree that our holding in *Kalil* is clear and unambiguous. I further agree that, in light of *Kalil*, we must interpret Spec. Sess. P.A. 15-2 to apply only prospectively under the operative savings statutes as construed in *Kalil*. My point is that the legislative history of Spec. Sess. P.A. 15-2, which the majority feels compelled to ignore under *Kalil*, should cause us to doubt the wisdom of the holding in *Kalil*.

[5] Senate Bill No. 952, as amended by Senate Amendment A, was introduced during the regular legislative session. See Substitute Senate Bill No. 952, Senate Amendment, Schedule A, LCO No. 9318, 2015 Sess. It passed the Senate but then was passed only temporarily by the House. The same legislation was taken up during the June Special Session, where it passed both chambers in the form of Spec. Sess. P.A. 15-2, § 1. The legislative background I discuss refers to statements made during both the regular and the special sessions.

State *v.* Bischoff

Tong characterized the Public Act as ''a second chance to get this right. We have a second chance to continue to be tough on crime but to be smarter on crime. Today we have a chance to take a major step in building a smart and smarter drug policy and to get this right.'' 58 H.R. Proc., Pt. 24, 2015 Sess., p. 8102.

Senator Eric D. Coleman introduced the bipartisan bill to the Senate during the regular session, explaining that Spec. Sess. P.A. 15-2, § 1, ''puts a greater emphasis on alternatives to incarceration and . . . treatment— perhaps hopefully a more rational treatment of nonviolent offenders.'' 58 S. Proc., Pt. 10, 2015 Sess., p. 3110. According to Senator Coleman, ''the bill . . . encourages we as policymakers and we who are concerned about the administration of criminal justice in our state to treat mere drug possession as something that requires medical treatment rather than criminal sanctions.'' 58 S. Proc., Pt. 12, June, 2015 Spec. Sess., p. 3542. The legislative history also makes clear that the bill was intended to help drug-dependent individuals reintegrate into society. Senator John A. Kissel noted: ''What I think this bill is about is redemption and our belief that most folks in our society may make a mistake, may make two, may make more, but fundamentally we believe people can turn their lives around.'' Id., p. 3545. In response to a question from Representative Charles J. Ferraro regarding how the bill would reduce crime, Representative Tong explained: ''I think the most accessible and most obvious [way] is that sentencing young people or any person, frankly, for simple possession for a mandatory minimum and a felony, has [the] potential and likelihood to ruin their life. . . . I think this is about recidivism, giving people a shot after they've made a mistake to get a job, [to] get on with their lives and to do good.'' 58 H.R. Proc., Pt. 24, 2015 Sess., p. 8160. Representative Richard A. Smith noted the change from a punitive to a rehabilitative model: ''I agree 1000

State *v.* Bischoff

percent that I would rather see someone who has a drug issue get treatment as opposed to [go] to jail. Jail does not serve that person. Jail does not serve society. It doesn't bring him or her back in and make that person a better person and a productive person.'' Id., p. 8137. Senator Martin M. Looney, the president pro tempore of the Senate, remarked on the change in policy, noting that ''unfortunately in our society we have too many people serving life prison sentences on the installment plan; in, out, in, out, back again, never really establishing themselves in society. And the difficulty is that those who have their prospects in life blighted by an early criminal conviction often, for a very minor drug offense, wind up being haunted by that and having prospects foreclosed for the rest of their lives.'' 58 S. Proc., Pt. 10, 2015 Sess., p. 3126. Senator Catherine A. Osten, who explained that she had worked in the Department of Correction for twenty-one years, made similar remarks and also noted the fiscal impact of over incarceration in this state: ''I think that this bill will finally take control of a population that does not deserve to be inside our correctional [system] and could actually be productive citizens, which is something that would be wonderful to see.'' Id., p. 3114. She added: ''In addition to that, I think that this finally starts realizing the second event that will happen as a result of this, and that is fiscal control . . . over a burgeoning correctional budget.'' Id.

These same sentiments were echoed by Governor Dannel P. Malloy, who made clear when signing Spec. Sess. P.A. 15-2 into law that the state was implementing ''systematic change'' and making a dramatic shift in its approach to nonviolent drug possessors: ''The cycle our system currently encourages—one of permanent punishment—hurts too many families and communities. When we should have been focusing on permanent reform, we focused on permanent punishment. For too

State *v.* Bischoff

long, we built modern jails instead of modern schools. Because this bill passed, Connecticut has taken a giant step into the future.'' (Internal quotation marks omitted.) D. Malloy, Press Release, Gov. Malloy Signs "Second Chance Society" Bill To Further Reduce Crime and Successfully Re-Integrate Nonviolent Offenders into Society (July 9, 2015), available at https://portal.ct.gov/ Malloy-Archive/Press-Room/Press-Releases/2015/07 -2015/Gov-Malloy-Signs-Second-Chance-Society-Bill-to -Further-Reduce-Crime-and-Successfully-ReIntegrate -Non (last visited January 14, 2020). "[M]ost of all,'' Governor Malloy said, "these initiatives are focused on turning nonviolent offenders into productive members of our society [who] can contribute to our economy, rather than drain it.'' (Internal quotation marks omitted.) Id.

Although there is no legislative history directly addressing the retroactive application of Spec. Sess. P.A. 15-2, there is strong circumstantial evidence that the legislature intended the ameliorative provisions contained therein to apply to individuals, like the defendant, who had not yet been sentenced as of the amendment's effective date. In his remarks, Representative Tong specifically included inmates like the defendant whose cases were then pending among the individuals who should not be incarcerated and who are part of a generation whose lives have been "ruined'' by the state's former policy: "By way of example, right now we have 500 [people] locked up in our state. . . . [T]he controlling offense, meaning the most serious offense is drug possession. Two hundred of them are there because of a sentence, *300 are in pretrial*. There are estimated [to be] about 1150 inmates, which includes parolees, for whom the controlling offense was drug possession. Over a generation, that's thousands of people. Thousands of people whose lives have been changed, and you might say ruined, because they made a mistake and because they were given a felony, and a mandatory

minimum. They went away for two years or longer, and they've not been able to get their lives in the right direction since.'' (Emphasis added.) 58 H.R. Proc., Pt. 24, 2015 Sess., pp. 8100–8101. Likewise, there is evidence that the fiscal savings expected by the legislature and calculated by the Office of Fiscal Analysis were based on the retroactive application of Spec. Sess. P.A. 15-2 to persons whose cases were pending on the statute's effective date. See Office of Fiscal Analysis, Connecticut General Assembly, Fiscal Note, House Bill No. 7104, An Act Implementing Provisions of the State Budget for the Biennium Ending June 30, 2017 Concerning General Government Provisions Relating to Criminal Justice.

The foregoing legislative history vividly reveals the ironic dissonance inhering in this court's decision to reject the amelioration doctrine. Most immediately, I find it ironic that we are required, in the name of deference to the will of the legislature, to defeat and frustrate the will of the legislature as it relates to the sentencing reform initiatives embodied in Spec. Sess. P.A. 15-2.[6] I agree with the majority that it is not necessarily ''absurd'' to believe that the legislature might have

_____

[6] To be clear, I am not suggesting that our holding today directly contravenes a deliberate, conscious, and articulated legislative intention to apply Spec. Sess. P.A. 15-2 retroactively. Although it seems clear from the legislative record that one of the main sponsors of the legislation, Representative Tong, almost certainly intended retroactive application to unsentenced violators, there is no evidence that the legislature as a whole gave the precise question any thought. I agree with the majority that, as a result of this legislative silence, our rules of construction since *Kalil* require us to *presume* an intention of a prospective only application. My point is that the presumptions we make regarding a prospective only legislative intention have caused the Judicial Branch in this case to impose and uphold a sentence that fundamentally conflicts with the explicit policies, purposes and principles animating the sentencing legislation that had been enacted at the time of the defendant's sentencing. Because that result is deeply counterintuitive, I would prefer, if writing on a clean (pre-*Kalil*) slate, to apply a rule of construction that employs the opposite presumption, namely, that the legislature intends ameliorative criminal statutes to apply retroactively.

State *v.* Bischoff

deemed the prior sentencing scheme ruinous and destructive but chose, at the same time, to apply its reform measures prospectively only. But such a legislative choice, even if not outright absurd, strikes me at the very least as exceedingly odd and counterintuitive and, therefore, unlikely; were it not for the precedential mandate of *Kalil*, I certainly would not presume from the legislature's silence in Spec. Sess. P.A. 15-2 regarding retroactive application that it intended for any future sentencing, occurring after the effective date of the amendment, to implement the very sentencing regime it had just denounced as inimical to good public policy.

The irony runs deeper still because, in my view, the legislative will that *Kalil* claimed to be upholding is based on a contested statutory construction *of our own making*. This point follows from my view, shared by scholarly commentators and a number of respected high courts, that general savings statutes do not compel the result reached in *Kalil*; instead, those statutes were intended to avoid the untoward and unintended consequences arising from strict application of the common-law abatement doctrine (as it interacts with the constitutional ex post facto doctrine) and were never actually intended by the legislature to preclude retroactive application of ameliorative amendments such as Spec. Sess. P.A. 15-2. See *State* v. *Kalil*, supra, 314 Conn. 563–64 (*Eveleigh, J.*, concurring and dissenting); see also E. Morrison, supra, 95 B.U. L. Rev. 341–42 ("General saving statutes were meant to address the limited problem of pardons resulting from the interplay between the doctrine of abatement and the constitutional prohibition against ex post facto laws. . . . General saving statutes were not intended to eliminate the amelioration doctrine, which merely offered a defendant the benefit of a reduction in penalty after a legislature amended

State *v.* Bischoff

the charging statute.'' (Footnotes omitted.)); footnote
3 of this opinion (citing cases). The expansion of the
savings statutes to encompass ameliorative amend-
ments within the scope of their presumption of prospec-
tive only application, in other words, is not the ineluc-
table and unavoidable outcome of legislative design and
intention. Rather, it is the result of a series of decisions
of this court imposing our gloss on the relevant stat-
utes.[7] The irony arises from the fact that we purport to

---

[7] The majority declines to accept responsibility for this court's active role
in producing the operative rule—the rule that ameliorative changes to the
sentencing scheme of a criminal statute are not retroactive unless explicitly
stated in the amending legislation—by pointing to the mandatory regime of
statutory construction imposed by General Statutes § 1-2z, the so-called
plain meaning statute. Again, I agree that *Kalil* settled that question when
it held that the text of the savings statutes creates a plain and unambiguous
rule. See *State* v. *Kalil*, supra, 314 Conn. 553 (declining to adopt the ameliora-
tion doctrine "because the doctrine is in direct contravention of Connecti-
cut's savings statutes"). I do not agree, however, that *Kalil* settled the
question correctly. At a purely textual level, the controversial question is
what the savings statutes mean by the word "repeal." Did those statutes,
when enacted, intend to include within their scope statutory amendments
that happen to be effectuated as a technical matter by the mechanism of a
repeal? See id., 563–64 (*Eveleigh, J.*, concurring and dissenting) ("[i]n my
view, these savings statutes do not apply because we are not dealing with
the repeal of a statute, as required by the savings statutes, rather, we are
dealing with an amendment to a statute"). The answer may be yes or it may
be no, but the text standing alone does not resolve the question. In other
words, although the savings statutes are perfectly clear that repealing stat-
utes will not be construed to be retroactive unless they provide for retroac-
tive application in express terms, the *scope* of those savings statutes—that
is, whether they apply to ameliorative amendments such as Spec. Sess. P.A.
15-2—is not at all obvious without major interpretive work supplied by the
judiciary. Indeed, this is the whole point of the cases and commentators
opining that such savings statutes were never meant to preclude adoption
of the amelioration doctrine. See, e.g., E. Morrison, supra, 95 B.U. L. Rev.
341 (explaining historical origin of savings statutes and reason why those
statutes do not preclude adoption of amelioration doctrine). The point is
particularly salient in Connecticut because we know for a fact that the
legislature enacted our savings statutes in the late nineteenth century specifi-
cally "to counter the effect of the common-law abatement doctrine" in direct
response to this court's decision in *State* v. *Daley*, 29 Conn. 272 (1860);
*State* v. *Kalil*, supra, 556; and not with any apparent intention to preclude
adoption of the amelioration doctrine. See id., 565–66 (*Eveleigh, J.*, concur-
ring and dissenting). I refuse to believe that fidelity to the statutory text

State *v.* Bischoff

undertake and execute our role in the construction of the savings statutes, and Spec. Sess. P.A. 15-2, under what I take to be the self-concealing and ill-fitting cloak of judicial restraint, as if the contested meaning, scope and application of these statutes arise out of the unmediated exercise of legislative will embodied in the "plain" meaning of the laws under review. The reality is that this court has played an active and important role formulating the rule of statutory construction governing the present case. Our holding in the present case enforces the rule that we articulated in *Kalil*.

This final point returns me to the reason that I concur in the judgment. The operative rule of statutory construction—accurately stated by the majority as holding "that changes [including ameliorative changes] to the sentencing scheme of a criminal statute are not retroactive unless explicitly stated [in the amending legislation]"; part I of the majority opinion—was made crystal clear by this court in *Kalil*, a decision issued in 2014 and therefore available to the legislature when Spec. Sess. P.A. 15-2 was debated and adopted. Under these circumstances, my disagreement with *Kalil* is not a sufficient reason to vote to reverse that precedent or its construction of the relevant savings statutes. "The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and . . . is an obvious manifestation of the notion that decisionmaking consistency itself has normative value."

requires us to blind ourselves to the particular historical context producing that text.

State *v.* Bischoff

(Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 519, 949 A.2d 1092 (2008). The principles underlying the doctrine of stare decisis are at their zenith when we are asked to overturn "a decision that involves the construction of a statute." (Internal quotation marks omitted.) Id., 520.

The arguments for and against the adoption of the amelioration doctrine were analyzed and resolved in *Kalil*. The defendant has not raised any new arguments—he "has simply repeated the arguments that the parties made and that this court rejected in [*Kalil*], which does not justify a departure from principles of stare decisis." *Spiotti* v. *Wolcott*, 326 Conn. 190, 204, 163 A.3d 46 (2017). If the legislature wishes to reverse the presumption established in *Kalil* for ameliorative statutes, it may enact legislation to that effect, as has been done in at least nine states.[8] Accordingly, I reluc-

[8] See 5 Ill. Comp. Stat. 70/4 (West 2013) ("[i]f any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect"); Ky. Rev. Stat. Ann. § 446.110 (LexisNexis 2010) ("[i]f any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect"); N.H. Rev. Stat. Ann. § 624:5 (2001) ("[n]o offense committed and no penalty or forfeiture incurred, under any of the acts repealed by house bill no. 75 of the 1955 session of the general court, and before the time when such repeal shall take effect, shall be affected by the repeal, except that when any punishment, penalty, or forfeiture shall be mitigated by the provisions of the Revised Statutes Annotated, such provisions may be extended and applied to any judgment to be pronounced after such repeal"); Ohio Rev. Code Ann. § 1.58 (B) (West 2004) ("[i]f the penalty, forfeiture, or punishment for any offense is reduced by a reenactment or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended"); Tex. Government Code Ann. § 311.031 (b) (West 2013) ("[i]f the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended"); Vt. Stat. Ann. tit. 1, § 214 (c) (2015) ("[i]f the penalty or punishment for any offense is reduced by the amendment of an act or statutory provision, the same shall be imposed in accordance with the act or provision as amended

tantly agree with the majority that we are bound by *Kalil* to hold that Spec. Sess. P.A. 15-2 does not apply retroactively to the defendant. I therefore concur in the judgment.

———————————————