******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KEITH BELCHER
(SC 20531)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.*

*Syllabus*

The defendant appealed from the trial court's denial of his motion to correct an illegal sentence. The defendant's lengthy prison sentence had been imposed in connection with his conviction of kidnapping in the first degree, sexual assault in the first degree, robbery in the first degree, burglary in the first degree, and attempt to commit sexual assault in the first degree. In his motion to correct, the defendant claimed, inter alia, that his sentence was imposed in an illegal manner insofar as the sentencing court relied on materially false information, namely, a baseless and subsequently discredited theory alleging the rise of teenage superpredators who would terrorize society. The defendant specifically claimed that the sentencing court improperly imposed his sentence on the basis of its characterization of the defendant as a "charter member" of that group of superpredators. The trial court rejected the defendant's claim, concluding, inter alia, that the evidence supported the determination that the defendant fit the definition of a "superpredator," regardless of the validity of that theory, and that the sentencing court's remarks about the superpredator theory were not central to its sentencing decision. On appeal from the trial court's denial of the defendant's motion, the defendant claimed that the trial court had abused its discretion in concluding that the sentencing court did not substantially rely on materially false information in sentencing him. *Held* that the trial court abused its discretion in denying the defendant's motion to correct an illegal sentence because the superpredator theory constituted materially false and unreliable evidence on which the sentencing court substantially relied in imposing the defendant's sentence: this court reviewed social science research and government reports and concluded that the superpredator theory was baseless when it originally was espoused by a university professor in the mid-1990s and has since been thoroughly debunked and universally rejected as a myth; moreover, this court determined that, in the context of the sentencing of the defendant, a Black teenager, the sentencing court's invocation of the baseless superpredator theory was especially detrimental to the integrity of the sentencing procedure, as the sentencing court relied on materially false, racial stereotypes that perpetuate systemic racial inequities, which historically have pervaded the criminal justice system, and as the sentencing court treated the characteristics of youth, namely, impulsivity, submission to peer pressure, and deficient judgment, as an aggravating, rather than a mitigating, factor, in violation of the precedent of this court and the United States Supreme Court; furthermore, the sentencing court substantially relied on the materially false superpredator theory when it sentenced the defendant, as that court gave explicit attention to the theory when it expressly referenced the defendant's supposed status as a charter member of the superpredator group prior to imposing the defendant's sentence, and the court's discussion of the superpredator theory throughout its brief sentencing remarks demonstrated that the sentencing court's view of the defendant was shaped by the theory that there was a group of youths, including the defendant, who were destined to live an irredeemable life of violence; accordingly, the trial court's decision to deny the defendant's motion to correct an illegal sentence was reversed, and the case was remanded with direction to grant the defendant's motion and for resentencing.

Argued January 11, 2021—officially released January 21, 2022**

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of kidnapping in the first degree and sexual assault in the first degree, and with

one count each of the crimes of robbery in the first degree, burglary in the first degree, and attempt to commit sexual assault in the first degree, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Hartmere, J.*; verdict and judgment of guilty, from which the defendant appealed; thereafter, the Appellate Court, *Foti*, *Schaller* and *Daly*, *Js.*, affirmed the trial court's judgment; subsequently, the court, *Devlin, J.*, dismissed in part and denied in part the defendant's motion to correct an illegal sentence, and the defendant appealed. *Reversed*; *further proceedings.*

*Michael W. Brown*, with whom, on the brief, was *Alexandra Harrington*, deputy assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Emily Dewey Trudeau*, assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Keith Belcher, a juvenile offender, appeals from the trial court's denial of his motion to correct an illegal sentence.[1] After his conviction, the defendant received a total effective sentence of sixty years of incarceration. He claims, inter alia, that the trial court improperly denied his motion to correct on the basis of the court's conclusion that the sentencing court did not impose the sentence in an illegal manner by relying on materially false information.[2]

Our review of the record reveals that the defendant established that the sentencing court substantially relied on materially false information in imposing his sentence, specifically, on the court's view that the defendant was a "charter member" of a mythical group of teenage "superpredators." Therefore, we conclude that the trial court abused its discretion in denying the defendant's motion to correct. Accordingly, we reverse the judgment of the trial court, and the case is remanded with direction to grant the defendant's motion and for resentencing.[3]

The following facts and procedural history are relevant to this appeal. "The defendant was fourteen years of age when, on December 24, 1993, he and a companion approached the victim in front of her apartment in Bridgeport. The victim was unloading groceries from her car when the defendant approached her from behind, pulled out a gun and demanded that she give him her purse. When she informed the defendant that the purse was upstairs, he dragged her up to the apartment to retrieve it, all the time holding the gun on her." *State* v. *Belcher*, 51 Conn. App. 117, 119, 721 A.2d 899 (1998). While in the apartment, the defendant sexually assaulted the victim twice, attempted to do so a third time, and pistol-whipped her. See id., 120.

Soon thereafter, based on the victim's identification of him from police photographs, the police arrested the defendant. Id. Proceedings against him were initiated in the docket for juvenile matters of the Superior Court. See id. Following a hearing, the court granted the state's motion to transfer the defendant's case to the regular criminal docket of the Superior Court. Id., 120–21. The state charged the defendant with two counts each of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B) and sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), and with one count each of attempt to commit sexual assault in the first degree in violation of General Statutes § 53a-49 (a) (2) and § 53a-70 (a) (1), robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and burglary in the first degree in violation of General Statutes (Rev. to 1993) § 53a-101 (a) (1). See id., 118–19, 121. The defendant was convicted on all

seven counts. Id., 121. The sentencing court imposed a total effective sentence of sixty years of incarceration.[4]

In the decades following the defendant's sentencing, juvenile sentencing law has undergone significant developments. These changes had their genesis in the decision of the United States Supreme Court in *Roper* v. *Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). In *Roper*, the court held that the execution of persons for crimes committed when they were children (under eighteen years of age) constitutes disproportionate punishment in violation of the eighth amendment to the federal constitution. Id., 564, 568, 575, 578. Children, the court explained, are different from adults for purposes of culpability and punishment, as certain characteristics of youth are, by their nature, mitigating. See id., 569–70. Children's " 'lack of maturity,' " " 'underdeveloped sense of responsibility,' " vulnerability to peer pressure and other outside influences, as well as the transient nature of their personality traits, led the court to conclude that "juvenile offenders cannot with reliability be classified among the worst offenders." Id.

Following *Roper*, decisions by this court and the United States Supreme Court have relied on these mitigating characteristics of youth to further define the constitutional limits of juvenile sentencing law. We recently summarized those limitations. "Under the federal constitution's prohibition on cruel and unusual punishments, a juvenile offender cannot serve a sentence of imprisonment for life, or its functional equivalent, without the possibility of parole, unless his age and the hallmarks of adolescence have been considered as mitigating factors. *Miller* v. *Alabama*, 567 U.S. 460, 476–77, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *Casiano* v. *Commissioner of Correction*, 317 Conn. 52, 60–61, 115 A.3d 1031 (2015), cert. denied sub nom. *Semple* v. *Casiano*, 577 U.S. 1202, 136 S. Ct. 1364, 194 L. Ed. 2d 376 (2016); *State* v. *Riley*, 315 Conn. 637, 641, 110 A.3d 1205 (2015), cert. denied, 577 U.S. 1202, 136 S. Ct. 1361, 194 L. Ed. 2d 376 (2016)." *State* v. *Williams-Bey*, 333 Conn. 468, 470, 215 A.3d 711 (2019). Thus, "[t]o comport with federal constitutional requirements, the legislature passed No. 15-84 of the 2015 Public Acts (P.A. 15-84) . . . [which] retroactively provided parole eligibility to juvenile offenders sentenced to more than ten years in prison." (Footnote omitted.) *State* v. *McCleese*, 333 Conn. 378, 383, 215 A.3d 1154 (2019). In addition, "[§] 2 of P.A. 15-84 . . . requires a court to consider the *Miller* factors [which are the aforementioned hallmarks of youth] when imposing certain sentences [on] juvenile offenders." Id., 400.

Relying on those changes to juvenile sentencing law, the defendant filed a motion to correct an illegal sentence, claiming that (1) the sentencing court failed to consider his youth, as required by *Miller* and its progeny, including the decision of this court in *State* v. *Riley*, supra, 315 Conn. 641 (sentencing court must consider

age related evidence in mitigation when deciding whether to irrevocably sentence juvenile offender to term of life imprisonment, or equivalent, without parole), (2) his sentence was disproportionate in violation of the eighth amendment to the United States constitution, (3) his sentence was disproportionate in violation of article first, §§ 8 and 9, of the Connecticut constitution, and (4) his sentence was imposed in an illegal manner because the sentencing court relied on materially false information, namely, a baseless and subsequently discredited theory alleging the rise of teenage superpredators who would terrorize society.

After hearing argument on the motion, the trial court initially concluded that the defendant was entitled to a new sentencing hearing pursuant to *Riley*. The court grounded its decision on its finding that the sentencing court had failed to give "mitigating effect to the defendant's young age and its hallmarks." Because the trial court's conclusion as to the defendant's *Miller* claim was dispositive, the court did not address the defendant's remaining three claims. Thereafter, the trial court stayed its order, pending the resolution of the appeals in *State* v. *Boyd*, 323 Conn. 816, 151 A.3d 355 (2016), and *State* v. *Delgado*, 323 Conn. 801, 151 A.3d 345 (2016). *Boyd* and *Delgado* addressed whether the parole eligibility retroactively conferred by P.A. 15-84 remedied a violation of the defendants' federal constitutional rights, as explicated in *Miller*. See *State* v. *Boyd*, supra, 820; *State* v. *Delgado*, supra, 802–804. Answering that question in the affirmative, we held that the trial court properly dismissed those defendants' motions to correct an illegal sentence for lack of subject matter jurisdiction. *State* v. *Boyd*, supra, 820–21; *State* v. *Delgado*, supra, 810–11, 816. Relying on those decisions, the trial court vacated its order granting the defendant a new sentencing hearing and dismissed, for lack of subject matter jurisdiction, the defendant's claim that the sentencing court had failed to give mitigating effect to the defendant's youth in violation of *Miller* and *Riley*.[5] The trial court also rejected the defendant's remaining three claims.[6]

The defendant appealed from the trial court's ruling to the Appellate Court. That court stayed the appeal, pending this court's disposition of *State* v. *McCleese*, supra, 333 Conn. 378, and *State* v. *Williams-Bey*, supra, 333 Conn. 468.[7] Following the official release of *McCleese* and *Williams-Bey* on August 23, 2019, and the decision of the Appellate Court lifting the stay, this appeal was transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Relevant to the resolution of this appeal, the defendant claims that the trial court abused its discretion in concluding that the sentencing court did not substantially rely on materially false information, in violation of his right to due process, in sentencing him to a total

effective sentence of sixty years of incarceration. Specifically, the defendant claims that his sentence was imposed in an illegal manner because the sentencing court relied on the erroneous and subsequently discredited theory of teenage superpredators in making its sentencing decision. We agree with the defendant and, accordingly, reverse the trial court's ruling.

The following additional facts and procedural history are relevant to this claim. Prior to the defendant's sentencing hearing on January 24, 1997, the sentencing court had reviewed the presentence investigation report (PSI), which the court stated was thorough and included school records and psychological reports.[8] The court heard argument from the prosecutor and defense counsel. In his remarks, the prosecutor emphasized the trauma suffered by the victim, who testified at trial that she would never be the same. The prosecutor also highlighted the defendant's "extensive juvenile record." In fact, when the defendant committed his crimes, he was on a holiday furlough from Long Lane School, which was a facility for delinquent children. School officials indicated that the defendant showed no remorse for his prior actions. The prosecutor referred the sentencing court to the PSI, arguing that the information therein supported a "substantial sentence . . . ."

Defense counsel argued in mitigation that the defendant was only fourteen years old when he committed his crimes, that he came from a "troubled background," and that this was his first conviction as an adult. Counsel acknowledged the defendant's juvenile history but pointed out that, with the exception of one conviction for assault in the second degree, that history involved nonviolent offenses.

The defendant's claim that his sentence was imposed in an illegal manner arises from the sentencing court's brief remarks prior to imposing the sentence. The court began by stating that, in arriving at the defendant's sentence, it relied on the PSI and the evidence presented at trial. Of particular import, the court explained, was the victim's testimony, which the court found "most compelling . . . ." On the basis of the evidence, the court said: "To say that the conduct here was extremely serious and egregious is simply to understate the facts of what happened. The conduct here was just so inhumane as to be considered subhuman. This is despite the fact that, as disclosed in the [PSI], [the defendant's] . . . testing shows average intelligence. He could have chosen another lifestyle, even at his very young age, but deliberately chose not to. *Professor John [J. DiIulio, Jr.], of Princeton University has coined the term 'superpredator,' which refers to a group of radically impulsive, brutally remorseless youngsters who assault, rape, rob and burglarize. Mr. Belcher, you are a charter member of that group.* You have no fears, from your conduct, of the pains of imprisonment; nor

do you suffer from the pangs of conscience. I agree with the [prosecutor], the probation officer, and the victim, who, incidentally, still suffers physically and psychologically from your conduct, who all ask for substantial incarceration to ensure the safety of the community." (Emphasis added.)

In rejecting the defendant's claim that the sentencing court's remarks demonstrated that it had substantially relied on materially false information in sentencing him, the trial court reasoned that the superpredator theory did not constitute "information." Specifically, the trial court observed that the term "superpredator" is descriptive, rather than factual. Additionally, the trial court noted that, although the superpredator theory has since been discredited, at the time of sentencing, the sentencing court had a reasonable basis to rely on the theory. The trial court finally observed both that the evidence supported the conclusion that the defendant fit the definition of a "superpredator," regardless of the truth of the theory, and that the sentencing court's remarks about the superpredator theory were not central to the sentencing decision. The trial court went on to say that "[t]he superpredator reference was just a gloss. This court has no doubt that, had Professor DiIulio repudiated his theory before sentencing, [the sentencing court] would have imposed the same sentence."

We begin by setting forth the legal principles that govern our review of the trial court's denial of the defendant's motion to correct a sentence imposed in an illegal manner. "[A] claim that the trial court improperly denied a defendant's motion to correct an illegal sentence is [typically] reviewed pursuant to the abuse of discretion standard . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Bischoff*, 337 Conn. 739, 745, 258 A.3d 14 (2021). We have explained, in pertinent part, that "[s]entences imposed in an illegal manner have been defined as being within the relevant statutory limits but . . . imposed in a way [that] violates [a] defendant's right . . . to be sentenced by a judge relying on accurate information or considerations solely in the record . . . ." (Internal quotation marks omitted.) *State* v. *Parker*, 295 Conn. 825, 839, 992 A.2d 1103 (2010). We have emphasized that the protection against sentencing in an illegal manner "reflects the fundamental proposition that [t]he defendant has a legitimate interest in the character of the procedure [that] leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process." (Internal quotation marks omitted.) Id.

We also have acknowledged that "[a] sentencing judge has very broad discretion in imposing any sentence within the statutory limits and in exercising that discretion he may and should consider matters that would not be admissible at trial. . . . Consistent with

due process the trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance. . . . It is a fundamental sentencing principle that a sentencing judge may appropriately conduct an inquiry broad in scope, and largely unlimited either as to the kind of information he may consider or the source from which it may come. . . . Finally, although a trial court's discretion is not completely unfettered, and information may be considered as a basis for a sentence only if it has some minimal indicium of reliability . . . [a]s long as the sentencing judge has a reasonable, persuasive basis for relying on the information which he uses to fashion his ultimate sentence, an appellate court should not interfere with his discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Bletsch*, 281 Conn. 5, 20–21, 912 A.2d 992 (2007).

To prevail on a claim that the sentencing court violated his due process rights by relying on materially false information, a defendant cannot merely allege that the information relied on by the court contained factual inaccuracies or inappropriate information. "[T]he mere reference to information outside of the record does not require a sentence to be set aside unless the defendant shows: (1) that the information was materially false or unreliable; and (2) that the trial court substantially relied on the information in determining the sentence." *State* v. *Collette*, 199 Conn. 308, 321, 507 A.2d 99 (1986). "A sentencing court demonstrates [substantial] reliance on misinformation when the court gives explicit attention to it, [bases] its sentence at least in part on it, or gives specific consideration to the information before imposing sentence." (Internal quotation marks omitted.) *State* v. *Parker*, supra, 295 Conn. 843 n.12.

We consider each of these factors in turn. First, a review of the superpredator theory and its history demonstrates that the theory constituted materially false and unreliable information. In the mid-1990s, Professor DiIulio of Princeton University coined the term "superpredator." J. DiIulio, "The Coming of the Super-Predators," The Weekly Standard, November 27, 1995, available at https://www.washingtonexaminer.com/weekly-standard/the-coming-of-the-super-predators (last visited January 20, 2022). DiIulio, whose work the sentencing court referenced specifically, warned that "the demographic bulge of the next [ten] years will unleash an army of young male predatory street criminals who will make even the leaders of the Bloods and Crips . . . look tame by comparison." Id. DiIulio predicted that this coming wave of superpredators would include "elementary school youngsters who pack guns instead of lunches" and "have absolutely no respect for human life . . . ." Id. He further warned: "On the horizon . . . are tens of thousands of severely morally impoverished juvenile super-predators. They are perfectly capable of

committing the most heinous acts of physical violence for the most trivial reasons (for example, a perception of slight disrespect or the accident of being in their path). They fear neither the stigma of arrest nor the pain of imprisonment. They live by the meanest code of the meanest streets, a code that reinforces rather than restrains their violent, hair-trigger mentality. In prison or out, the things that super-predators get by their criminal behavior—sex, drugs, money—are their own immediate rewards. Nothing else matters to them. So for as long as their youthful energies hold out, they will do what comes 'naturally': murder, rape, rob, assault, burglarize, deal deadly drugs, and get high." Id.

These dire predictions centered disproportionately on the demonization of Black male teens. DiIulio warned readers that, although "the trouble will be greatest in [Black, inner city] neighborhoods," those in other areas should expect a "spill over" of morally impoverished, "crime-prone young males." Id. A few months later, in an article about race, crime and law enforcement, DiIulio wrote: "[N]ot only is the number of young [B]lack criminals likely to surge, but also the [B]lack crime rate, both black-on-black and black-on-white, is increasing, so that as many as [one] half of these juvenile super-predators could be young [B]lack males." J. DiIulio, "My Black Crime Problem, and Ours," City Journal, Spring, 1996, available at https://www.city-journal.org/html/my-black-crime-problem-and-ours-11773.html (last visited January 20, 2022).

Extensive research data and empirical analysis quickly demonstrated that the superpredator theory was baseless. In fact, contrary to DiIulio's assertion, even at the time that he coined the term in the mid-1990s, juvenile offense rates already had dropped significantly from their peak across demographic groups. The falsity of DiIulio's claim was demonstrated in a 2000 bulletin of the United States Department of Justice, which provided a data-driven assessment of juvenile crime patterns through the 1990s. See Office of Juvenile Justice and Delinquency Prevention, U.S. Dept. of Justice, Challenging the Myths, 1999 National Report Series: Juvenile Justice Bulletin (February, 2000), available at https://www.ojp.gov/pdffiles1/ojjdp/178993.pdf (last visited January 20, 2022), adopted from H. Snyder & M. Sickmund, National Center for Juvenile Justice, Juvenile Offenders and Victims: 1999 National Report (September, 1999), available at https://www.ncjrs.gov/html/ojjdp/nationalreport99/toc.html (last visited January 20, 2022). The bulletin revealed that, although serious juvenile offense rates did peak in the late 1980s into the early 1990s, "by 1995, the rate had returned to its traditional level." Id., p. 2. The bulletin concluded that, therefore, "[r]ather than providing evidence for development of a juvenile superpredator, the . . . data indicate that, despite a temporary increase, the rate of serious juvenile offending as of the mid-[1990s] was

comparable to that of a generation ago." Id.

In 2001, the United States Office of the Surgeon General labeled the superpredator theory a myth. See U.S. Dept. of Health & Human Services, Youth Violence: A Report of the Surgeon General (2001) c. 1, p. 5, available at https:// www.ncbi.nlm.nih.gov/books/NBK44297/?report=reader (last visited January 20, 2022) ("There is no evidence that young people involved in violence during the peak years of the early 1990s were more frequent or more vicious offenders than youths in earlier years. . . . There is no scientific evidence to document the claim of increased seriousness or callousness . . . ." (Citation omitted.));[9] see also, e.g., F. Zimring, American Youth Violence (1998) pp. 61–63 (critiquing use of temporal spike in youth violence to predict future trends); F. Zimring, "The Youth Violence Epidemic: Myth or Reality?," 33 Wake Forest L. Rev. 727, 728 (1998) (challenging predictions of " 'coming storm' " of juvenile superpredators as distortion of statistics and "fundamentally unscientific" guesswork). We conclude that the superpredator theory was baseless when it originally was espoused and has since been thoroughly debunked and universally rejected as a myth, and it therefore constituted false and unreliable information that a sentencing court ought not consider in crafting a sentence for a juvenile offender.

In the context of the sentencing of the defendant, a Black teenager, the court's reliance on the materially false superpredator myth is especially detrimental to the integrity of the sentencing procedure for two reasons. First, reliance on that myth invoked racial stereotypes, thus calling into question whether the defendant would have received as lengthy a sentence were he not Black. Second, the use of the superpredator myth supported treating the characteristics of youth as an aggravating, rather than a mitigating, factor. To fully appreciate how the use of this term was not simply a gloss but, rather, an inappropriate sentencing consideration, some historical and sociological context is needed.[10]

The superpredator theory tapped into and amplified racial stereotypes that date back to the founding of our nation. Specifically relevant to the present case, the dehumanization of Black children pervades this country's history. In 1776, when Thomas Jefferson, a slave owner, declared "all men are created equal," in many of the colonies, Black adults and children were property and "were not legally considered human . . . ." (Internal quotation marks omitted.) J. Bell, W. Haywood Burns Institute for Youth Justice Fairness & Equity, Repairing the Breach: A Brief History of Youth of Color in the Justice System (2015) p. 1, available at https://burnsinstitute.org/ wp-content/uploads/2020/09/Repairing-the-Breach-BI_ compressed.pdf (last visited January 20, 2022).

As one legal scholar has observed, throughout the

history of our country, our policies have reflected that only some children—white ones—have deserved societal protection. See K. Nunn, "The Child as Other: Race and Differential Treatment in the Juvenile Justice System," 51 DePaul L. Rev. 679, 679–82 (2002). Professor Kenneth B. Nunn explained that the mid-nineteenth century saw the birth of the concept of "adolescence," resulting in a shift from the understanding of children over the age of ten as a labor resource for families to a class of persons deserving of societal protection. Id., 679–80. A particular part of this shift arose from concerns regarding a rise in childhood poverty and a perception of increasing crime among children. See, e.g., T. Birckhead, "The Racialization of Juvenile Justice and the Role of the Defense Attorney," 58 B.C. L. Rev. 379, 395–96 (2017). Those concerns prompted social reforms, grounded in the doctrine of parens patriae,[11] aimed at directing " 'wayward youth' " to reform schools rather than incarcerating them with adult prisoners. Id., 396–97. Notably, the protections and progressive social innovations afforded by these reforms were not provided to Black children, who were considered " 'unsalvageable and undeserving' " of the "citizen-building ideals" that had prompted the changes. Id., 398; see, e.g., G. Ward, The Black Child-Savers: Racial Democracy and Juvenile Justice (2012) pp. 52–62 (discussing role of race in differential treatment of white and Black juveniles during antebellum period); see also, e.g., id., 52 (noting that, during antebellum period, "[e]arly . . . reformatories were typically first open exclusively to whites"). As a result, by 1850, rather than being sent to reform schools, "a disproportionate number of Black youths were jailed in cities with majority white populations."[12] T. Birckhead, supra, 398.

At the time that adolescence was being recognized as a distinct developmental stage for white children, many Black children remained enslaved and were viewed as subhuman. See, e.g., K. Nunn, supra, 51 DePaul L. Rev. 680. In contrast to white children in their teens, Black children could be separated from their parents, bought and sold like chattel. See, e.g., id.; see also, e.g., J. Bell, supra, p. 6. The nascent concept of adolescence, therefore, did not apply to them. See, e.g., K. Nunn, supra, 680. The historical fiction that Black adolescents are not actually "children," meriting societal protection, stems from the dehumanization of Black Americans and is one of the roots of the disparate treatment of Black teens by the justice system. See, e.g., P. Goff et al., "The Essence of Innocence: Consequences of Dehumanizing Black Children," 106 J. Personality & Soc. Psych. 526, 526–29, 539–41 (2014) (documenting connection between dehumanization of Black male children, perception that they are older and less innocent than white peers, and disparate treatment of Black male children in juvenile justice system); see also footnote 14 of this opinion (illustrating disparate

treatment).

Against this backdrop, the superpredator myth employed a particular tool of dehumanization—portraying Black people as animals. See, e.g., P. Goff et al., supra, 106 J. Personality & Soc. Psych. 528 (documenting historical dehumanizing association of Black people, including first Black president of United States, with nonhuman primates). A "predator" is defined as "one that preys, destroys, or devours," or "an animal that depends on predation for its food . . . ." Webster's Third New International Dictionary (2002) p. 1785. The superpredator metaphor invoked images of packs of teens prowling the streets. The news coverage in the mid-1990s, which depicted "young Black males, showing them [handcuffed] and shackled, held down by [the] police, or led into courtrooms wearing orange jumpsuits"; T. Birckhead, supra, 58 B.C. L. Rev. 410; left little doubt that the "packs" were Black teens.

The superpredator myth triggered and amplified the fears inspired by these dehumanizing racial stereotypes, thus perpetuating the systemic racial inequities that historically have pervaded our criminal justice system. Looming on the apocalyptic horizon were tens of thousands of these fabricated, subhuman superpredators, who would "do what comes 'naturally': murder, rape, rob, assault, burglarize, deal deadly drugs, and get high." J. DiIulio, "The Coming of the Super-Predators," supra. A threat on this scale called for a response. And the response came in the form of a public panic and media frenzy, prompting nearly every state in the country to step up the sentencing and punishment of juveniles. See, e.g., J. Short & C. Sharp, Disproportionate Minority Contact in the Juvenile Justice System (2005) p. 7 ("[b]etween 1992 and 1999, [forty-nine] states and the District of Columbia passed laws making it easier for juveniles to be tried as adults through statutory exclusion, mandatory waiver, direct file by prosecutors, or presumptive waiver legislation");[13] see also, e.g., F. Zimring, "The Power Politics of Juvenile Court Transfer: A Mildly Revisionist History of the 1990s," 71 La. L. Rev. 1, 8 (2010); D. Bishop, "Juvenile Offenders in the Adult Criminal Justice System," 27 Crime & Just. 81 (2000). This shift in the law subjected "juvenile offenders to sentencing regimes that were originally conceived for adults . . . ." *Miller* v. *Alabama* (No. 10-9646), United States Supreme Court Briefs, October Term, 2011, Amici Curiae Brief of Jeffrey Fagan et al., pp. 7–8. And the consequences of the changes to juvenile justice fell disproportionately on Black teens.[14]

The second reason the superpredator myth constituted particularly harmful materially false information for sentencing purposes is because it turns upside down the constitutional mandate of *Roper* and its progeny. By labeling a juvenile as a superpredator, the very characteristics of youth that should serve as mitigating fac-

tors in sentencing—impulsivity, submission to peer pressure, deficient judgment—are treated instead as aggravating factors justifying harsher punishment. The superpredator theory and the correspondingly harsh punishment of juvenile offenders cannot be reconciled with the recognition in *Roper* v. *Simmons*, supra, 543 U.S. 551, that the medical and social science research demonstrates that "the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." (Internal quotation marks omitted.) Id., 570; see, e.g., *Miller* v. *Alabama*, supra, 567 U.S. 477 (requiring that, in sentencing juveniles to life without possibility of parole, courts must consider in mitigation child's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"); *State* v. *Riley*, supra, 315 Conn. 659–60 (applying *Miller* to sentence of functional equivalent of life imprisonment without possibility of parole and holding that *Miller* applies to discretionary sentencing schemes, as well as mandatory ones).

In summary, by invoking the superpredator theory to sentence the young, Black male defendant in the present case, the sentencing court, perhaps even without realizing it, relied on materially false, racial stereotypes that perpetuate systemic inequities—demanding harsher sentences—that date back to the founding of our nation. In addition, contrary to *Roper* and its progeny, in relying on the superpredator myth, the sentencing court counted the characteristics of youth as an aggravating factor against the defendant. Although we do not mean to suggest that the sentencing judge intended to perpetuate a race based stereotype, we cannot overlook the fact that the superpredator myth is precisely the type of materially false information that courts should not rely on in making sentencing decisions. Whether used wittingly or unwittingly, reliance on such a baseless, illegitimate theory calls into question the legitimacy of the sentencing procedure and the sentence.

Having concluded that the superpredator doctrine was materially false information, we next must determine whether the sentencing court *substantially relied* on the materially false and unreliable superpredator theory in arriving at the defendant's sentence. In other words, we review the record to determine whether the sentencing court gave explicit attention to the superpredator theory, whether that court based its sentence at least in part on it, or whether that court gave specific consideration to the theory before imposing sentence. See *State* v. *Parker*, supra, 295 Conn. 843 n.12. Because the test is framed in the disjunctive, any of the three conditions would suffice. We conclude that the sentencing court did all three.

We already have observed that the sentencing court's

remarks were brief—the court's comments occupied less than one and one-half pages of the sentencing transcript. The court expressly referenced the defendant's supposed status as a "charter member" of the superpredator group, and the court's comments regarding the superpredator theory comprised a substantial portion of its brief remarks. Given that the court's brief remarks were heavily directed at and shaped by the superpredator theory, it is evident that the court gave explicit attention to the theory, gave specific consideration to it and also based its sentence, in part, on the fact that it considered the defendant a superpredator.

Furthermore, the sentencing court's discussion of the superpredator theory throughout its brief remarks demonstrates that the court's view of the defendant was shaped by this theory that there was a group of youths who were destined to live an irredeemable life of violence and that the defendant was a "member" of that group. The sentencing court described the superpredator group as "a group of radically impulsive, brutally remorseless youngsters who assault, rape, rob and burglarize." Echoing DiIulio's description of superpredators, the court stated to the defendant: "You have no fears, from your conduct, of the pains of imprisonment; nor do you suffer from the pangs of conscience." The court went further and called the defendant a "charter member" of that fictitious group. This was more than a mere gloss or broad statement. The court's reliance on the superpredator theory, and its view that it had to protect society from a charter member of this remorseless group, dominated its sentencing remarks. The superpredator theory, and the court's application of that theory to the defendant, was central to the court's sentencing determination. It was the prism through which the court viewed this defendant. The sentencing court's explicit attention to the superpredator theory demonstrates that the court substantially relied on that baseless and now debunked theory when sentencing the defendant. See, e.g., *State* v. *Parker*, supra, 295 Conn. 843 n.12. Consequently, we conclude that reliance on the false and pernicious superpredator theory in the present case so infected the sentencing that the sentence was imposed in an illegal manner.

It is axiomatic "that [t]he defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence . . . ." (Internal quotation marks omitted.) Id., 839. We conclude that, because the superpredator theory constituted materially false, and, therefore, unreliable, evidence on which the sentencing court substantially relied, the trial court abused its discretion in denying the defendant's motion to correct an illegal sentence. The defendant's sentence was imposed in an illegal manner, in violation of his right to due process.

The trial court's decision is reversed and the case

is remanded to that court with direction to grant the defendant's motion to correct an illegal sentence and for resentencing.

In this opinion the other justices concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices D'Auria, Mullins, Kahn, Ecker and Keller. Thereafter, Justice McDonald was added to the panel and has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

** January 21, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

We note that the trial court dismissed in part the defendant's motion to correct. We are concerned only with the trial court's denial of that motion; see footnote 3 of this opinion; and our reversal of the trial court's ruling pertains to the denial rather than the dismissal in part of that motion.

[2] The issue of whether a sentencing court has imposed a sentence in an illegal manner by relying on materially false information frequently has arisen when the court relied on factually inaccurate information in a presentence investigation report in imposing a defendant's sentence. See, e.g., *State* v. *Parker*, 295 Conn. 825, 832, 992 A.2d 1103 (2010). Our decisions, however, have used the phrases "inaccurate information," "false information" and "misinformation" interchangeably for purposes of applying the standard. See, e.g., *State* v. *Ward*, 341 Conn. 142, 156,     A.3d     (2021) ("inaccurate information"); *State* v. *Parker*, supra, 832 ("misinformation"); id., 844 ("inaccurate information" and "materially false" information (internal quotation marks omitted)); *State* v. *Collette*, 199 Conn. 308, 319, 507 A.2d 99 (1986) ("false information"). We recognize that there is a distinction between the inaccuracy of facts set forth in a report and the falsity of a theory. Both share, however, the core defect that renders a sentence illegal—in each instance, the sentencing court has relied on something that is not true. In the present case, we believe that the phrase "false information" is the best fit for the sentencing court's reliance on a false theory.

[3] The defendant also raises two other claims. First, he claims that the trial court incorrectly denied his motion to correct an illegal sentence because his sentence is disproportionate, in violation of the eighth amendment to the United States constitution. Second, the defendant asserts that the trial court incorrectly concluded that it lacked jurisdiction over his claim that, in light of evolving standards of decency, his sentence was disproportionate, in violation of article first, §§ 8 and 9, of the Connecticut constitution. Because our resolution of the defendant's claim that the sentencing court relied on materially false information requires us to remand the case for resentencing, resolution of these additional claims is not necessary to this appeal.

[4] The court sentenced the defendant, on the first count, for kidnapping in the first degree, to twenty years, on the second count, for kidnapping in the first degree, to twenty years, on the third count, for robbery in the first degree, to ten years, on the fourth count, for sexual assault in the first degree, to twenty years, on the fifth count, for sexual assault in the first degree, to twenty years, on the sixth count, for attempt to commit sexual assault in the first degree, to ten years, and, on the seventh count, for burglary in the first degree, to ten years. The court further ordered counts two, five and six to run concurrently to count one, and counts three, four and seven to run consecutively to count one, for a total effective sentence of sixty years of imprisonment.

[5] We emphasize that our holding today is grounded solely on the sentencing court's imposition of the defendant's sentence in an illegal manner by relying on materially false information. That is, we do not ground our holding on the sentencing court's failure to give mitigating effect to the defendant's youth and its hallmark features. As we have explained, our decisions have held that such a pre-*Miller* failure would not require resentencing. See *State* v. *Williams-Bey*, supra, 333 Conn. 470; *State* v. *Delgado*, supra, 323 Conn. 804.

[6] Specifically, the trial court held that, in light of the gravity of the underlying offenses, the defendant's sentence was not disproportionate, in violation of the eighth amendment. The court concluded that it lacked jurisdiction over the defendant's claim that the passage of No. 15-183 of the 2015 Public Acts—which bars, but for one narrow exception, the transfer of fourteen

year olds to the regular criminal docket—demonstrated that contemporary standards of decency dictated that sentencing a fourteen year old to sixty years of incarceration was disproportionate, in violation of article first, §§ 8 and 9, of the Connecticut constitution. Finally, the trial court rejected the defendant's claim that, by stating in its ruling that the defendant was a "charter member" of an alleged demographic group of teenage "superpredators," the sentencing court relied on materially false information in sentencing him.

[7] Both decisions held that the parole eligibility granted retroactively by P.A. 15-84, § 1, remedies a *Miller* violation under the Connecticut constitution. See *State* v. *Williams-Bey*, supra, 333 Conn. 470, 472–73, 477; *State* v. *McCleese*, supra, 333 Conn. 381, 383, 387.

[8] The PSI revealed that the defendant had an extensive juvenile delinquency history, including an incident in which he shot his younger sister. The PSI also revealed that the defendant had rejected "any efforts at rehabilitation" and had been diagnosed with " 'severe conduct disorder.' "

[9] By the late 1990s, after a steady decline in juvenile crime, DiIulio recanted his theory and expressed regret that he had promulgated it. See, e.g., E. Becker, "As Ex-Theorist on Young 'Superpredators,' Bush Aide Has Regrets," N.Y. Times, February 9, 2001, p. A19 ("DiIulio said, while praying at Mass on Palm Sunday in 1996, that he had an 'epiphany' . . . . He tried, he said, to put the brakes on the superpredator theory, which had all but taken on a life of its own. 'I couldn't write fast enough to curb the reaction . . . .' "). He admitted, on more than one occasion, that his views had turned out to be completely wrong. See, e.g., id. ("DiIulio . . . conceded today that he wished he had never become the [1990s] intellectual pillar for putting violent juveniles in prison and condemning them as 'superpredators' ").

Notably, in the landmark case of *Miller* v. *Alabama*, supra, 567 U.S. 460, DiIulio signed on to an amici curiae brief filed in support of the petitioners, which denounced the superpredator theory as a "myth" grounded on "baseless" predictions. *Miller* v. *Alabama* (No. 10-9646), United States Supreme Court Briefs, October Term, 2011, Amici Curiae Brief of Jeffrey Fagan et al., p. 8. The United States Supreme Court ultimately sided with the juvenile offenders, writing that a young person's immaturity reduces his or her accountability and that juveniles have an inability to assess consequences, are often rash, and prone to risk-taking—mitigating factors that should be considered at sentencing. See *Miller* v. *Alabama*, supra, 471, 476–77.

[10] We do not intend to provide a comprehensive review of the relevant historical background of the ideas underlying the superpredator myth. Instead, we highlight some aspects of that background that are particularly helpful to understanding why the superpredator theory constitutes materially false information for purposes of sentencing. For thorough discussions of the historical underpinnings of the disparate treatment of Black children in the juvenile justice system, see G. Ward, The Black Child-Savers: Racial Democracy and Juvenile Justice (2012), and Our Children, Their Children (D. Hawkins & K. Kempf-Leonard eds., 2005).

[11] "Parens patriae" literally means " 'parent of the country' " and "refers traditionally to role of state as sovereign and guardian of persons under legal disability, such as juveniles . . . ." (Citation omitted.) Black's Law Dictionary (6th Ed. 1990) p. 1114.

[12] We recognize that the protections afforded to adolescents in the juvenile justice system have not followed a direct trajectory. That is, the recognition of adolescence as a stage of human development has not guaranteed that teenagers receive an ever increasing, or even stable, level of protection under the law. Instead, it is widely acknowledged that juvenile justice has swung in a pendulum between the goals of rehabilitation and punishment. See, e.g., J. Radice, "The Juvenile Record Myth," 106 Geo. L.J. 365, 378–83 (2018) (providing historical overview of shifts between rehabilitative and punitive purposes of juvenile justice system); C. Loomis-Gustafson, "Adjusting the Bright-Line Age of Accountability Within the Criminal Justice System: Raising the Age of Majority to Age 21 Based on the Conclusions of Scientific Studies Regarding Neurological Development and Culpability of Young-Adult Offenders," 55 Duq. L. Rev. 221, 225–27 (2017) (same). Through each swing of the pendulum, however, Black children always have been seen as less capable of rehabilitation than white children because of the pervasive view of Black children as subhuman. See, e.g., K. Nunn, supra, 51 DePaul L. Rev. 679–81.

[13] Like many other states, in the mid-1990s, Connecticut revised its laws to make it easier to try juveniles as adults. See, e.g., Public Acts 1995, No. 95-225, § 13 (revising juvenile transfer provision to allow automatic transfer

to regular criminal docket for child charged with commission of capital felony, class A or B felony, or violation of General Statutes § 53a-54d; previous language required court to make written findings, after hearing, that probable cause existed to believe child committed charged crime prior to such transfer).

[14] In 1999, the United States Department of Justice reported: "Overrepresentation of [B]lack juveniles occurs at all stages of the juvenile justice system. In 1996–97, while 26 [percent] of juveniles arrested were [B]lack, they made up 45 [percent] of cases involving detention. Thirty-two percent of adjudicated cases involved [B]lack youth, yet 40 [percent] of juveniles in residential placement are [B]lack. Even recognizing the overrepresentation of [B]lack juveniles involved in violent crimes reported by victims (39 [percent]), they still accounted for a disproportionate share of juvenile arrests for violent crime (44 [percent]) and confinement (45 [percent])." Office of Juvenile Justice and Delinquency Prevention, U.S. Dept. of Justice, Minorities in the Juvenile Justice System, 1999 National Report Series: Juvenile Justice Bulletin (December, 1999) p. 2, available at https://www.ojp.gov/pdffiles1/ojjdp/179007.pdf (last visited January 20, 2022), adopted from H. Snyder & M. Sickmund, supra.

Particularly relevant to the present case were the racial disparities in the sentencing stage. Specifically, in 1998, the Office of Juvenile Justice and Delinquency Prevention reported that "[j]uvenile court judges [were] more likely to place [Black] youth in residential placement facilities, and less likely to place [Black] youth on probation in comparison to similarly situated white youth. Although 32 [percent] of cases adjudicated delinquent involved [Black youth], a larger proportion of those cases (36 [percent]) were ordered into residential placement facilities than received probation (31 [percent]). Overall, white youth were underrepresented among cases receiving residential placement and overrepresented among cases receiving probation. The disparity between white and Black children [was] present across all offense categories . . . ." (Footnotes omitted.) K. Nunn, supra, 51 DePaul L. Rev. 686.

Connecticut reported similar disparities within the state's juvenile justice system during the relevant time period. See E. Hartstone & D. Richetelli, An Assessment of Minority Overrepresentation in Connecticut's Juvenile Justice System (1995), available at https://www.ojp.gov/pdffiles1/Digitization/155321NCJRS.pdf (last visited January 20, 2022). In order to comply with the 1988 amendment to the Juvenile Justice and Delinquency Prevention Act of 1974, Pub. L. No. 93-415, 88 Stat. 1109, the state of Connecticut commissioned a study to evaluate overrepresentation of minority children in secure facilities. Id., p. 1. The study evaluated data from 1990 to 1992. See id., pp. 14, 20, 21. Although 1990 census data reflected that roughly 11 percent of Connecticut's population of ten to sixteen year olds were Black, Black youth accounted for approximately 28.6 percent of youths referred to the court of juvenile matters for instant offenses, including felonies, misdemeanors, violation or status charges, 46 percent of youths placed in detention for such offenses, and 46.6 percent of youths placed in Long Lane School for such offenses. See id., p. 21 (figure 2).

In Bridgeport specifically, where the defendant committed his offenses, although white juveniles accounted for 61 percent of the 10 to 16 year old population, they comprised only 27 percent of those referred to court, 10 percent of those placed in detention, and less than 6 percent of those placed in Long Lane School. Id., p. 28. By contrast, Black juveniles accounted for less than 20 percent of the 10 to 16 year old population, yet comprised 40 percent of those referred to court, 52 percent of those placed in detention and 54 percent of those placed in Long Lane School. Id.

The Connecticut study revealed that, "[f]or all types of offenses, Black juveniles were several times more likely than [w]hite juveniles to be placed in detention." Id., 41. Furthermore, those Black juveniles charged with serious juvenile offenses remained in detention longer than white juveniles charged with similar offenses. See id., 65. This disparity was particularly notable in Bridgeport. Id.

Black juveniles charged with nonserious juvenile offenses were more likely than white juveniles charged with similar offenses to be handled judicially. Id. Black juveniles charged with serious juvenile offenses were more likely than white juveniles charged with similar offenses to be adjudicated for serious juvenile offenses. Id., 66. The report clarified that "[r]ace/ethnicity was found to indirectly impact this decision, as race/ethnicity significantly predicts detention decisions and detention predicts [a serious juvenile offense] adjudication." (Emphasis omitted.) Id. Similarly, "race/

ethnicity was found to be an indirect predictor of court commitment to Long Lane School" because "race/ethnicity significantly predicts detention decisions and detention predicts commitment to Long Lane School." Id.

_____